John Clinton BELLCOURT,
Petitioner, Appellant,

v.

STATE of Minnesota, Respondent.

No. C7–85–1553.

Supreme Court of Minnesota.

June 27, 1986.

William Kennedy, Hennepin Co. Public Defender, David M. Duffy, Michael H. McGlennen, Asst. Co. Public Defenders, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Thomas L. Johnson, Hennepin Co. Atty., Vernon E. Bergstrom, Chief, Appellate Section, Lee W. Burry, Asst. Co. Atty., Minneapolis, for respondent.

AMDAHL, Chief Justice.

This case comes before us on defendant's appeal from a judgment entered on his conviction for first-degree felony murder. He specifically complains of the trial court's refusal to instruct the jury on the revival of an aggressor's right to self-defense and its refusal to submit to the jury the lesser-included offenses of third-degree murder and manslaughter in the first and second degrees. We affirm.

On Thursday, February 10, 1983, defendant was drinking beer with an acquaintance, Frank Norris, at defendant's home at 3128 Minnehaha Avenue in south Minneapolis. Having run out of beer and money, defendant and Norris decided to rob the Minnehaha Liquor Store at the corner of Lake Street and Minnehaha, just 2 blocks away. Since defendant was a regular customer at the store and knew he would be recognized, he covered his fingerless left hand with a mitten and his face with a ski mask. Defendant and Norris then drove over and parked in a lot down the street from the store. As they walked up to the store, they passed the Duncan Tire Company. The owner, Malcolm Duncan, saw them and noted that it was unusual for someone to be wearing a mask on such a warm (approximately 20° F.) day.

At approximately 3:15 p.m., defendant and Norris entered the liquor store. In his coat pocket defendant was carrying a .357 magnum revolver. On duty at the store were the checkout clerk, Eileen Riddle; the owner, James Nordin; his son, Paul; and Dave Ceason, the store's delivery driver. As defendant and Norris entered the store, the Nordins and Ceason were in the backroom eating lunch and talking. Riddle had just stepped into the walk-in cooler near the entrance to the backroom when she was confronted by defendant who was pointing the gun at her stomach. Defendant told Riddle to empty the tills and Riddle complied by putting all the currency from the cash register into a brown 6-pack size paper bag. Riddle immediately recognized the voice as Bellcourt's and also identified his stub fingers by the way the mitten

covered his hand. As Riddle emptied the till, defendant began walking back toward the backroom, alternating pointing the gun at Riddle, the backroom, and Riddle again.

After Norris entered the store, he apparently headed for the backroom. Just to the left of the doorway as one enters the backroom is a safe and next to that is a short counter where Paul Nordin and Ceason were eating. James Nordin was standing next to the safe talking to them. Norris came into the backroom and said he needed some assistance in the store. James Nordin headed out of the backroom but stopped in the doorway, apparently upon seeing defendant. Norris then came into the backroom, walked around Paul Nordin, and swung a bottle at Ceason's head. Ceason blocked the swing with his hand and the bottle bounced across the countertop. Norris then told Paul Nordin and Ceason to get down on the floor, which they did.

As Ceason laid on the floor, he looked at Norris. Norris told Ceason to turn his head away. When Ceason refused, Norris threw Ceason's jacket at him but missed, covering Paul's head instead. Norris then threw a roll of towels at Ceason which bounced off Ceason's head. Ceason finally turned away when Norris picked up a steak knife which Paul Nordin had been using to eat his lunch.

Defendant ordered James Nordin to open the safe. Defendant then ordered Riddle and a female customer into the backroom while Nordin was opening the safe. Riddle, who left the bag containing the money on the counter, and the customer stepped into the backroom as Norris stepped out. James Nordin glanced over at Riddle and motioned with his eyes for her to get out of the way. Riddle and the customer then stepped back and laid on the floor.

Defendant took a couple of steps into the store to make sure it was clear. As he stepped back into the backroom, James Nordin stood up in front of the safe. Nordin apparently reached under his smock, where he kept a .38 revolver holstered to his belt, turned and shot defendant. The bullet hit defendant in the chest at an angle, about 4 inches below his left nipple, went through part of his stomach, and broke a rib on the right side of his back. According to expert testimony, Nordin's gun was between 6 to 24 inches from defendant's chest when the shot was fired.

Defendant testified that the shot knocked the wind out of him and he began losing control of his body. He took a couple of sidesteps and fell on the floor; the ski mask had turned on his face, partially obstructing his vision. Through one eyehole, he saw a gun coming toward his face, with the hand holding the gun becoming white and tightening. He testified that he tried to readjust the mask with his bad hand, but he just made the problem worse and his gun "went off." He finally got the mask off, yelled "I think I'm hit," got up and ran out of the store.

Paul Nordin testified that as he lay on the floor he heard two or three shots. He lifted the coat covering his head and saw his father leaning on a garbage can, about 3 feet in front of the safe, and defendant lying on his right side on the floor. Defendant's mask had come off. Paul stated that his father said something like "No, John, don't" and defendant began to fire again. Paul saw the bullets come out James' back, then James pivoted and fell on his face.

Riddle also testified to hearing "a couple" shots and a thud. She looked up and saw defendant, maskless, lying on his right side. She put her head back down and heard more shots, then dead silence. She did not hear Nordin say anything during the shooting.

Ceason also testified that he did not hear Nordin speak during the shooting. He had turned and saw flashes and smoke and what sounded like firecrackers. He testified it looked as though Nordin was dancing or trying to step on the firecrackers. Ceason looked at Nordin, who was leaning on the garbage can, unarmed, and saw bullets come out of Nordin's back. Nordin pivoted and fell.

Defendant testified that when he got up and ran out of the store, he did not see Norris anywhere and did not stop at the counter to pick up the money. When defendant got to the sidewalk, he said he saw Norris sitting in the car up ahead. Duncan, however, testified that he saw the pair walk past his store together, with Norris just a step ahead of defendant. He said that defendant was carrying a brown 6-pack size paper bag. Defendant was arrested later that evening at his home.

James Nordin died at the scene from massive internal hemorrhaging caused by gunshot wounds. Defendant was convicted by a Hennepin County jury of first-degree murder and sentenced to life imprisonment. This appeal is from the judgment entered upon the trial court's denial of defendant's petition for postconviction relief.

■ 1. The first issue presented is whether defendant was entitled to a jury instruction on self-defense. In Minnesota, three conditions must exist in order to excuse or justify the use of deadly force under Minn.Stat. §§ 609.06, .065 (1984):

(1) The killing must have been done in the belief that it was necessary to avert death or grievous bodily harm.

(2) The judgment of the defendant as to the gravity of the peril to which he was exposed must have been reasonable under the circumstances.

(3) The defendant's election to kill must have been such as a reasonable man would have made in light of the danger to be apprehended.

*State v. Austin*, 332 N.W.2d 21, 24 (Minn. 1983) (citations omitted). Once the issue of self-defense is raised, the state has the burden of proving beyond a reasonable doubt that the killing was not justifiable. *Id.* at 23; *State v. Housley*, 322 N.W.2d 746, 750 (Minn.1982).

■ An aggressor in an incident has no right to a claim of self-defense. However, where the defendant is the original aggressor in an incident giving rise to his self-defense claim, an instruction on self-

defense will be available to him only if he actually and in good faith withdraws from the conflict and communicates that withdrawal, expressly or impliedly, to his intended victim. *State v. Graham*, 292 Minn. 308, 310, 195 N.W.2d 442, 444 (1972). While Minnesota case law on this issue is scant, case law from other jurisdictions makes clear that an aggressor has the duty to employ all means in his power to avert the necessity of killing, and before his right to self-defense may be revived, he must clearly manifest a good-faith intention to withdraw from the affray and must remove any just apprehension or fear the original victim may be experiencing. *Melchior v. Jago*, 723 F.2d 486, 493 (6th Cir.1983), *cert. denied*, 466 U.S. 952, 104 S.Ct. 2156, 80 L.Ed.2d 542 (1984). If the circumstances are such that it is impossible for defendant to communicate the withdrawal, " 'it is attributable to his own fault and he must abide by the consequences.' " *State v. Huemphreus*, 270 N.W.2d 457, 462 (Iowa 1978) (quoting 40 Am.Jur.2d *Homicide* § 150 (1968)).

■ In the present case, a self-defense instruction would be justified only if a reasonable juror could find that defendant had withdrawn from the confrontation. Clearly, there was no withdrawal here. At the time defendant was shot, he was holding five people at gunpoint. After being hit, he fell to the floor but held on to his gun. Had he truly intended to withdraw from the robbery and communicate that withdrawal to his victim, he would have either released the gun, said something to the effect of "I give up," or both. Instead, he lifted his gun in James Nordin's direction and pulled the trigger 5 times. Defendant then rose, ran out of the store, and was seen by a disinterested witness carrying a bag that we can assume contained the robbery loot. In other words, after the shooting, defendant completed the robbery by his asportation of the money. Even if Duncan had been mistaken about who was carrying the bag, defendant would still be responsible for the completion of the crime as an accomplice. *See* Minn.Stat. § 609.05

(1984). Defendant clearly did not withdraw from the crime and an instruction on self-defense would have been improper.

2. The next issue the court must address is whether the trial court erred in refusing to submit to the jury the lesser-included offenses of third-degree murder, first-degree manslaughter, and second-degree manslaughter. Before closing arguments, the court discussed the matter with counsel and with defendant. The court was willing to submit second-degree murder as a lesser-included offense, but not any of the other requested crimes. Defendant then opted to submit the case only on the crime charged in the complaint, first-degree felony murder. The state consented to this and the court granted defendant's request for an "all-or-nothing" verdict.

■ A lesser-included offense is necessarily included if it is impossible to commit the latter without also committing the former. *State v. Roden*, 384 N.W.2d 456, 457 (Minn.1986). In determining whether an offense is a lesser-included offense, the court looks at the elements of the offense, not the facts of the particular case. *Id.* If the offense is a lesser-included offense, the next issue is whether the lesser-included offense should be submitted to the jury. As summarized in *State v. Jordan*, 272 Minn. 84, 136 N.W.2d 601 (1965):

(a) A person prosecuted for a crime may be convicted either of the crime charged or an included crime, but not both.

(b) If a defendant is guilty as charged, or not at all, instructions with respect to lesser but included crimes are not appropriate.

(c) If the evidence adduced at trial would permit a finding of guilty of an included crime, defendant is entitled to appropriate instructions advising the jury of its power to return a verdict of guilty of the lesser offense.

(d) The right of the defendant to have such instructions given to the jury may be waived (d1) expressly or (d2) implicitly by failure to make proper request for such submission.

(e) Where the jury is provided with forms of verdicts and paragraph (c) above applies, a form of verdict should be included for use by the jury if it finds the defendant guilty of the lesser but included offense.

*Id.* at 86–87, 136 N.W.2d at 604 (footnotes omitted).

■ The test used in determining whether to submit a lesser-included offense to a jury is whether the evidence provides a rational basis for an acquittal on the offense charged and a conviction on the lesser offense. *State v. Leinweber*, 303 Minn. 414, 422, 228 N.W.2d 120, 125–26 (1975). Thus, "proof of the elements which differentiate the two crimes must be sufficiently in dispute so that a jury" may make this distinction. *State v. Adams*, 295 N.W.2d 527, 532 (Minn.1980). If a trial court were to submit a lesser offense simply because "[a] jury has the power to acquit irrationally in the teeth of overwhelming evidence of guilt," *State v. Patch*, 329 N.W.2d 833, 836 (Minn.1983), it runs the risk that the verdict will be based on sympathy for the defendant rather than on the evidence. *See State v. Dolliver*, 154 Minn. 297, 303, 191 N.W. 594, 596 (1923).

■ The determination of what, if any, lesser offense to submit to the jury lies within the sound discretion of the trial court, *LaMere v. State*, 278 N.W.2d 552, 558 (Minn.1979); *Leinweber*, 303 Minn. at 421, 228 N.W.2d at 125; but where the evidence warrants an instruction, the trial court must give it. *See State v. Lee*, 282 N.W.2d 896, 900 (Minn.1979). The failure to give an appropriate instruction on lesser offenses is a ground for reversal only if defendant is prejudiced thereby. *See State v. Edwards*, 343 N.W.2d 269, 276 (Minn. 1984).

■ There is no question that third-degree murder, first-degree manslaughter, and second-degree manslaughter are all lesser-included offenses of first-degree murder. *See State v. Galvan*, 374 N.W.2d 269, 271 (Minn.1985) (first-degree heat-of-passion manslaughter is a lesser-included

offense of felony murder in the second degree); *Leinweber*, 303 Minn. at 421, 228 N.W.2d at 125 (every lesser degree of homicide is intended to be characterized as an included offense). Therefore, the only question this court must address is whether, as to each lesser crime, the evidence would reasonably support a conviction on the lesser degree and an acquittal on the greater·offense. *See Leinweber*, 303 Minn. at 422, 228 N.W.2d at 125–26.

The trial court ruled that it would instruct the jury on first-degree felony murder, as set forth in the indictment, and that it was also willing to submit second-degree felony murder. The only difference between the two charges as applicable to this case is that first-degree felony murder requires intent to kill, while second degree does not. *Compare* Minn.Stat. § 609.-185(3) (1984) with Minn.Stat. § 609.19(2) (1984). Defendant argues that his request for the lesser-included offenses of third-degree murder, Minn.Stat. § 609.195 (1984); heat-of-passion manslaughter in the first degree, Minn.Stat. § 609.20(1) (1984); and culpably negligent manslaughter in the second degree, Minn.Stat. § 609.205(1) (1984), should have been granted. The trial court properly denied this request.

Defendant argues that the killing was "severed" from the aggravated robbery when Nordin shot him and approached him as if he was going to shoot again. We have never spoken of "severance" in the felony-murder context. In Minnesota, we ascribe to the res gestae theory that the felony-murder rule is applicable where the "felony and the killing * * * are parts of one continuous transaction." *Kochevar v. State*, 281 N.W.2d 680, 686 (Minn.1979). In many cases, the felony-murder rule can apply even though the underlying felony is complete. *See State v. Murphy*, 380 N.W.2d 766, 771 n. 3 (Minn.1986). In this case, there is no real question that defendant killed James Nordin while committing

the crime of aggravated robbery. With the presence of those two elements, it would be impossible for a jury to convict defendant of any of the proposed lesser-included crimes without also finding him guilty of either first- or second-degree murder. Thus, the trial court had no occasion to give instructions on the proposed lesser-included crimes.[1] The only question is whether defendant intended to kill his victim. Defendant waived the submission of second-degree murder for which no intent to cause death is required, instead opting for the all-or-nothing approach of giving the jury only a first-degree murder instruction. The trial court properly refused to submit the lesser-included offenses.

Affirmed.

---

1. In passing these felony-murder laws, the legislature merely codified this court's longstanding rule that anyone who prepares himself for a robbery by obtaining a loaded gun, thus preparing to shoot anyone who obstructs the robbery or his escape, raises an inference of premeditation and intent to shoot and kill which is not only permissible, but virtually inescapable. *State v. Campbell*, 281 Minn. 1, 13, 161 N.W.2d 47, 55 (1968).