STATE of Minnesota, Respondent,

v.

Michael Alan MERRILL, Appellant.

No. C0–87–815.

Supreme Court of Minnesota.

July 29, 1988.

Melissa Sheridan, Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, State Atty. Gen., St. Paul, Brian D. Simonson, Asst. St. Louis Co. Atty., Hibbing, for respondent.

YETKA, Justice.

Appellant, Michael Alan Merrill, was convicted after a jury trial in St. Louis County District Court on one count of second-degree murder and two counts of first-degree murder. On appeal, he challenges the sufficiency of the evidence and the refusal of the trial court to instruct the jury on lesser included offenses and alleges prosecutorial misconduct in closing arguments. Appellant also appeals from an order of the district court denying his petition for post-conviction relief, which requested a new trial based on a claim of newly discovered evidence. We affirm the convictions with admonitions to the prosecutor's office.

## I.

Appellant was convicted for his participation with two accomplices in the robbery and stabbing death of Clifford Enroth on August 6, 1986, in Hibbing, Minnesota. On August 8, 1986, Enroth's body was discovered in his rural Hibbing home after he failed to meet his parents at their cabin. Enroth was found lying on his back in his wheelchair, nude except for a towel around his neck. Enroth, a native of Hibbing, was a Vietnam veteran who lost both his legs when he stepped on a buried Viet Cong shell. Although a double amputee, he was able to walk with artificial limbs and crutches. He also used a wheelchair.

As a result of police investigation, appellant, Kenneth Robinson and Debra Chamblee were soon identified as suspects and were subsequently indicted. The state alleged that appellant and Chamblee aided and assisted Robinson in causing Enroth's death. Robinson is alleged to have actually stabbed Enroth. Thus, appellant was convicted as an accomplice pursuant to Minn.Stat. § 609.05 (1986). Chamblee testified under a grant of immunity at appellant's trial. Robinson refused to testify, invoking his rights under the fifth amendment to the United States Constitution. Appellant testified on his own behalf. This is a direct appeal from the judgment of conviction.

In July 1986, appellant was released from the Oregon State Correctional Institute after serving time for burglary in the second degree. His parole officer placed him in the Greenhaven Motel, Eugene, Oregon, a halfway house for parolees. On the day of his release, appellant met Debra Chamblee, who was living in her car near the motel with her young daughter. Appellant and Chamblee began living together approximately 3 days later. They soon decided to leave Oregon, despite his parole status, and go to Hibbing, Minnesota, where he had relatives. Robert Hutchinson, a prison acquaintance, and Robinson, another Greenhaven resident also decided to go with them.

The four left Oregon late in July and drove to Hibbing in Chamblee's car. They went to appellant's grandmother's house, but were told to stay away by her son. They camped for a few days near Hibbing and then Chamblee rented an apartment in Hibbing. Chamblee falsely told the owner that she would be living there with her daughter, but actually moved in with appellant, Hutchinson and Robinson. They forced Hutchinson to move out soon after because his habitual paint sniffing was ruining the apartment and the car.

During the first week of August, appellant, Robinson and Chamblee began to patronize the Airway Inn, a Hibbing bar. They became friendly with Richard Neilssien, the bartender. In the early evening of August 5, 1986, appellant, Robinson and Chamblee went to the Airway Inn after drinking and smoking marijuana earlier that day. Around 8:00 p.m., Clifford Enroth came into the bar and sat next to Chamblee. Enroth was described at trial as very friendly and trusting, and it was not unusual for him to meet and talk with people he met in bars.

Chamblee introduced Enroth to appellant and Robinson and the four sat together for approximately an hour, talking about hunting and fishing. Enroth invited the others to go to his home for a sauna and to go fishing with him the next day.

After Chamblee got swimming suits from the apartment, the four left the bar with some liquor. They stopped at Buddy's Tavern to buy cigarettes and orange juice. Charles Dillon, who worked at Buddy's, spoke with Enroth, appellant and Robinson. Dillon described Robinson as "wired" and said that he talked extensively about guns. Robinson told Dillon that he knew Enroth had several guns.

Tom Lind, a friend of Enroth's, spoke with Enroth outside Buddy's Tavern. He saw a man with very long hair in Enroth's truck next to a car with two people inside it. Enroth told Lind that they were going to have a sauna at his home. Lind saw the truck leave, going towards Enroth's home with the other car following.

At Enroth's, the four sat in the dining room drinking, talking and smoking marijuana. Enroth, who said he was no longer on drugs, smoked only a small amount of marijuana. Enroth showed them his house, his stereo and his guns. Later, the four took a sauna. Enroth had removed his prostheses and was using his wheelchair to move around by that time.

After the sauna, Robinson passed out in the garage. Appellant helped him to the living room couch and also passed out. Earlier in the evening, Enroth had asked appellant if he could have sex with Chamblee, and appellant replied that it was up to her. While appellant and Robinson were asleep, Chamblee and Enroth talked. Chamblee told Enroth that appellant was physically abusive and had threatened to "plant" (meaning to kill) her. She said that he had hit her, pinched her and pulled her hair on several occasions. Enroth offered to help her and called a crisis center to locate a shelter for battered women. Enroth arranged to take Chamblee to the Women's Coalition in Duluth the next morning. They planned for Chamblee to return to her apartment with Robinson and appellant, pack and meet Enroth at his home at 10:00 a.m. to go to Duluth. Chamblee and Enroth returned to the sauna and had consensual sexual relations.

Chamblee got dressed and woke appellant and Robinson to leave. Appellant and Robinson got dressed and left with Chamblee in her car. Appellant, however, forgot to take his shoes and socks with him.

Chamblee was very nervous and appellant asked her what had happened at Enroth's. Chamblee testified that appellant began to slap her and bang her head on the dashboard of the car, accusing her of having sex with Enroth. She testified further that, to stop him from beating her, she lied to appellant, telling him that Enroth had raped her at gunpoint with a sexual device.

Appellant was enraged over the alleged rape. Chamblee testified that he turned the car around to return to Enroth's and said that he would kill him. When they arrived at Enroth's, Enroth let Robinson and appellant in and appellant asked what had happened with Chamblee. Enroth reminded appellant that he had said it was up to Chamblee whether she wanted to have sexual intercourse. Appellant yanked Enroth's wheelchair out from under him, causing him to fall and hit his head. Appellant said that he felt bad then and helped Enroth back into the chair. He saw a cut over Enroth's right eye at that time.

Appellant pushed Enroth in his wheelchair into the living room and asked Enroth where his gun was. After Enroth said it was in a table near the front door, Robinson got the gun and began waving it. Appellant told him not to shoot and Robinson stuck the gun into his pants.

Appellant then told Robinson to bring Chamblee in from outside. When she came in, she began screaming, calling Enroth names and slapping him in the face. Chamblee testified that she wanted to stop Enroth from talking in order to prevent appellant from beating her again. Appellant went into Enroth's bedroom to look for valuables to compensate Chamblee for the rape. He took a camera, binoculars, watch and Enroth's wallet along with some other goods into the living room. Appellant then told Chamblee to go back outside.

Enroth begged them to leave him alone. Appellant said he told him no one would hurt him, but explained that they were going to take some things to compensate Chamblee.

Appellant told Robinson, who was armed with a kitchen knife as well as the gun, to watch Enroth and returned to the bedroom for a pillowcase to carry the stolen goods. Enroth was sitting at the kitchen table at that time. Appellant was angry, ranting and cursing. At one point, he yelled "just cut his * * * throat." He said the statement was not directed at Robinson, but that he was more or less ranting to himself.

When appellant returned to the living room, he saw Enroth lying on his back in his wheelchair on the floor. Enroth was naked except for a towel over his mid-section. Appellant looked at Enroth's throat to make sure Robinson had not killed him. Appellant said he was relieved to see no wounds or blood except for the cut over Enroth's eye. He thought Enroth was alive, but unconscious.

Appellant picked up the pillowcase and a trash bag filled with beer cans from their earlier drinking because he was concerned about fingerprints as he was in violation of his Oregon parole. Appellant testified that Robinson also took Enroth's guns from the gun cabinet.

Appellant and Robinson left the house and found Chamblee outside still crying. She said appellant was laughing hysterically. They placed the stolen goods and the trash in Chamblee's car. They drove off and appellant stopped near a dumpster so Robinson could throw away the garbage. He saw Robinson with a kitchen knife with an 8–inch blade, but saw no blood on the blade. Robinson also discarded the knife in the dumpster.

Appellant was barefoot and had blood on his feet so he took a shower when they returned to the apartment. The three packed and left Hibbing by 6:30 a.m. on August 6. They headed for Spokane, Washington, where Robinson's family lived. On the way to Washington, they sold some of Enroth's property to finance the trip. After reaching Spokane, they stayed with Robinson's sister for several days and then began camping in People's Park. In Spokane, they sold more of Enroth's property, including Enroth's guns.

Meanwhile, Enroth's nude body had been discovered. Lying on his back in the wheelchair, his arms were outstretched with an unlit cigarette on the floor near his hand. His blood-stained pajama bottoms were near him on the floor. There were blood spots on Enroth's crutches, in the bathroom, kitchen, near the front door and near the fireplace. There was a cut over Enroth's eye and two wounds in his chest.

In the bedroom, officers found that the phone had been ripped from the wall, the bedding had been removed and the safe was open. Enroth's gun cabinet was empty. Three knives were missing from the kitchen knife blocks. No fingerprints linking appellant, Robinson or Chamblee were found.

Dr. Roberta Zimmerman, the pathologist and medical examiner, observed the body at Enroth's home and later performed the autopsy. She found three wounds. The cut over the right eye was ¼–inch deep going to the skull bone and would be the type to bleed profusely. One chest wound was very shallow. The third wound was a deep stab wound, 3½ to 4 inches deep through the breast bone, lung and heart. The object which caused the wound was described as less than ¼–inch thick, consistent with a steak knife similar to Enroth's missing knives. The cause of death was found to be the stab wound to the heart. Dr. Zimmerman found no defensive wounds on Enroth's body.

Because of the blood flow pattern, Dr. Zimmerman concluded that the cut over the eye was inflicted approximately 10 minutes prior to the fatal wound. Again based on the blood flow pattern, she concluded that the chest wounds were inflicted while Enroth was either lying down or in the process of falling back. Terry Laber, a lab analyst with the Bureau of Criminal Apprehension and an expert serologist in the analysis of blood stains and spatters, agreed with Dr. Zimmerman's analysis.

Because Enroth had been seen with appellant, Robinson and Chamblee the night before his death, the investigation soon focused on them. A nationwide stop-and-hold order was issued for the three. On

August 10, 1986, a search warrant was issued and executed at their Hibbing apartment. During the search, several blood spots were found outside the apartment. No blood was found in the apartment itself.

On August 21, Chamblee left Spokane and returned to Oregon. Gary Drean, the father of one of her children, told her that the police were looking for her. Chamblee contacted the Oregon state police and gave a statement about Enroth's murder. She told police where appellant and Robinson could be located. Appellant and Robinson were arrested in Spokane on August 22.

Appellant, Robinson and Chamblee were indicted by a grand jury in Hibbing on three counts of murder in the first degree: Count I—premeditated murder pursuant to Minn.Stat. § 609.185(1) (1986); Count II—intentional felony murder while committing aggravated robbery; and Count III—intentional felony murder while committing burglary, both pursuant to Minn.Stat. § 609.185(3) (1986). After a jury trial, appellant was convicted for the lesser included offense of second-degree murder on Count I and for murder in the first degree on Counts II and III.

Robinson was subsequently convicted of all three counts of murder in the first degree. After appellant's original appeal was filed, Robinson executed a sworn affidavit stating that he alone "caused the death of Clifford Enroth, by and through self defense." He also stated that appellant "took no part at all in the death of Clifford Enroth, nor did he have the knowledge that I was arguing with or that I had killed Enroth." Pursuant to appellant's motion, this court, on December 23, 1987, stayed the appeal and remanded the matter to district court for a hearing on appellant's petition for post-conviction relief. On March 8, 1988, the district court denied appellant's petition for post-conviction relief. Appellant thereafter requested the court to reinstate his original appeal and also to review the district court's denial of his petition for post-conviction relief.

The issues raised on appeal are:

1. Was the evidence sufficient to sustain appellant's conviction for first-degree murder?

2. Did the trial court err in refusing to instruct the jury on the lesser included offenses of first-degree murder?

3. Is appellant entitled to a new trial because of newly discovered evidence?

4. Was appellant denied a fair trial due to prosecutorial misconduct during closing argument, thus requiring a new trial?

## II.

Appellant first argues that the evidence is insufficient, as a matter of law, to sustain his conviction. In reviewing a claim based on the sufficiency of the evidence, the court must review the record and determine whether, based on the facts established and any legitimate inferences that can be drawn from them, a jury could reasonably find the defendant guilty of the offense. *State v. Merrill*, 274 N.W.2d 99, 111 (Minn.1978). In our review of the record, we must view the evidence in the light most favorable to the jury's verdict, assuming the jury believed the state's witnesses and disbelieved any evidence to the contrary. *State v. Wahlberg*, 296 N.W.2d 408, 411 (Minn.1980). Any conflicting evidence must, therefore, be resolved in state's favor.

However, the due process clause of the fourteenth amendment to the United States Constitution requires the state to prove each element of the crime charged beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970); *State v. Jones*, 347 N.W.2d 796, 800 (Minn.1984).

In the present case, the state does not contend that appellant actually killed Clifford Enroth. Instead, appellant was convicted as an accomplice under Minn.Stat. § 609.05, subds. 1, 2 (1986) for his participation in the crime. Appellant acknowledges that he was present in Enroth's home on the night he was killed while also acknowledging his active participation in

the underlying burglary and aggravated robbery. The major thrust of appellant's argument is that the evidence is, nevertheless, insufficient to establish his intentional participation in the killing under Minn.Stat. § 609.05 (1986).

Minn.Stat. § 609.05 (1986) reads in relevant part:

Subdivision 1. A person is criminally liable for a crime committed by another if the person intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime.

Subd. 2. A person liable under subdivision 1 is also liable for any other crime committed in pursuance of the intended crime if reasonably foreseeable by the person as a probable consequence of committing or attempting to commit the crime intended.

The statute imposes liability on an accomplice for the crimes of another in two distinct ways. Under subdivision 1, liability is imposed "for actions which affect the principal, encouraging him to take a course of action which he might not otherwise have taken." *State v. Ulvinen*, 313 N.W. 2d 425, 428 (Minn.1981). A conviction for aiding and abetting requires only "some knowing role in the commission of the crime" by a defendant who "takes no steps to thwart its completion." *Jones*, 347 N.W.2d at 801 (quoting *State v. Strimling*, 265 N.W.2d 423, 429 (Minn.1978)).

In addition, a person may also be held liable for the crimes of an accomplice under subdivision 2 if the accomplice's crime was committed in furtherance of and was a reasonably foreseeable consequence of the intended crime. *State v. Filippi*, 335 N.W.2d 739, 742 (Minn.1983).

In some cases, it is clear that liability may be imposed under only one of the foregoing separate analyses. *See, e.g., Filippi*, 335 N.W.2d at 742. In the present case, however, the jury was instructed that liability could be imposed under either subdivision.

Appellant's primary argument is that the evidence is insufficient to establish his active, intentional participation in the killing.

Appellant admits to being present and to his participation in the aggravated robbery of Enroth. However, he maintains that this is insufficient to establish, beyond a reasonable doubt, that he was an accomplice to the intentional murder of Enroth.

■ Under well-established precedent, it is clear that companionship and conduct before and after the offense are factors from which the requisite criminal intent may be inferred. *State v. Parker*, 282 Minn. 343, 355, 164 N.W.2d 633, 641 (1969). *See also State v. Goodridge*, 352 N.W.2d 384, 389 (Minn.1984). Appellant contends, however, that more than his mere presence at the scene is necessary to establish the level of activity required of one who aids and abets in the commission of a crime. For this premise, he relies primarily on *Ulvinen*, 313 N.W.2d at 428, where the court construed section 609.05, subdivision 1 as requiring "conduct that encourages another to act."

The facts in *Ulvinen*, however, are quite different from the facts established here. In *Ulvinen*, the defendant was asleep downstairs when her son killed his wife. After the killing, her son woke her and asked her to keep his children out of the bathroom while he dismembered his wife's body. The defendant later helped clean up the blood and lied to investigators to protect her son. Earlier, her son had told the defendant that he intended to kill his wife and she had done nothing to prevent the killing. The court, finding her acts to be "morally reprehensible," nonetheless reversed her conviction for murder, holding that something more than "mere inaction" is required to impose criminal liability as an accomplice under Minn.Stat. § 609.05, subd. 1 (1986). Significantly, in *Ulvinen*, all of the defendant's actions were taken *after* the crime had been completed. Under *Ulvinen* then, if appellant had merely been present at the scene and had never participated in any criminal conduct until after Enroth's death, a stronger argument could perhaps be made that the evidence is insufficient to sustain his conviction.

That is not, however, the state of the evidence in this case. Appellant was clearly more than an innocent bystander who assisted Robinson only after the killing was completed. It is undisputed that appellant made the decision to return to Enroth's home after hearing Chamblee's rape fabrication. According to Chamblee, appellant decided to return to Enroth's home to kill him for raping her. Appellant admitted that he intended to steal items from Enroth to compensate Chamblee for her suffering from the alleged rape, but denied going back with the intention of killing him. However, he admitted to knocking Enroth out of his wheelchair, causing the cut to his forehead. He later shared in the profits and participated in the sale of Enroth's property. Appellant decided to remove the beer cans from Enroth's house to prevent his identification from fingerprints and immediately fled the state. His involvement in the circumstances here is much greater and more extensive than was the defendant's in *Ulvinen.*

Appellant, nevertheless, argues that, even assuming these facts to be true, there is insufficient evidence to establish that he actively participated in or had any knowledge of the killing. Appellant correctly notes that there was no direct evidence that he, rather than Robinson, actually stabbed Enroth. The state does not contend that this issue is in dispute, but, in fact, maintains that Robinson was the actual killer. However, since appellant was charged as an accomplice under section 609.05, subdivision 1, he may be held criminally liable for the murder even though he did not actively participate in the overt act of the primary offense itself. *State v. Goodridge,* 352 N.W.2d 384, 389 (Minn. 1984); *Matter of Welfare of M.D.S.,* 345 N.W.2d 723, 733 (Minn.1984); *State v. Strimling,* 265 N.W.2d 423, 429 (Minn. 1978).

Moreover, the state argues that the evidence also supports a reasonable inference that Robinson stabbed Enroth because appellant ordered him to do so. The state suggests that appellant's actions before and after the crime establish him as the

"leader" of the three. According to both appellant and Chamblee, for example, appellant ordered Chamblee to stay in the car, then told Robinson to bring her inside. Both obeyed. He then ordered Chamblee back outside after he told her to stop slapping Enroth. Appellant also told Robinson to watch Enroth while he decided what to steal. In conjunction with these facts, the state suggests that, when appellant shouted "cut his * * * throat," he fully intended and expected Robinson to obey as it would appear both Robinson and Chamblee had been doing throughout the evening.

Respondent denies that he intended Robinson to kill Enroth, maintaining that he was shouting because he was upset and intoxicated. He explains that he was actually only talking to himself rather than to Robinson. He also suggests that his actions demonstrate that, rather than intending to kill Enroth, he was attempting to prevent Robinson and Chamblee from hurting him. He testified that he told Robinson to put the gun away and that he stopped Chamblee from slapping Enroth. He assured Enroth that they wouldn't hurt him any more. Also, he claims that he thought Enroth was unconscious, but alive, when he left the house.

It is not necessary for this court to determine on review whether or not the jury could have believed that appellant ordered Robinson to kill Enroth. Under the limited standard of review applicable, it is only necessary to establish that a rational jury could reasonably conclude from these facts that appellant was guilty of the crime charged. Under relevant cases construing section 609.05, subdivision 1, appellant's admissions—that he was present and actively participating in the aggravated robbery—in conjunction with his anger and earlier violence towards Enroth and his subsequent flight, forms an adequate basis to sustain the jury's verdict. *See Jones,* 347 N.W.2d at 801. When the evidence and all reasonable inferences to be drawn are considered in the light most favorable to the verdict, the evidence is overwhelming to sustain appellant's conviction.

In the alternative, appellant may also be criminally liable under Minn.Stat. § 609.05, subd. 2 (1986) even if he did not encourage or intend Robinson to kill Enroth. Under subdivision 2, the following test must be met: (1) the murder must have been committed in furtherance of the aggravated robbery and (2) the murder must have been reasonably foreseeable as a probable consequence of the robbery. *Filippi*, 335 N.W. 2d at 742.

Appellant does not directly address this subdivision of the statute. However, it would appear to be undisputed that the murder was committed in furtherance of the robbery (*i.e.*, to prevent identification of the three accomplices or to facilitate escape). Therefore, part one of the test has been met. The only question is whether or not appellant could have reasonably foreseen that Robinson would kill Enroth.

This court has previously recognized that the burglary of a dwelling "always carries with it the possibility of violence." *State v. Nunn*, 297 N.W.2d 752, 754 (Minn.1980). In fact, even when the burglary has been of a business establishment at a time when it could be reasonably expected to be empty, the court has found the evidence sufficient to establish the foreseeability of violence, remarking:

> Whenever two people commit a burglary it is reasonably foreseeable that they might encounter some person or that the burglary might be interrupted by the police or someone else. Whether one party to a conspiracy to burgle could have reasonably foreseen that the other might commit an assault in the event of such an encounter or interruption is a question of fact for the jury. But in making its factual determination, the jury is entitled to make reasonable inferences from the evidence, including inferences based on their experiences or common sense.

*Filippi*, 335 N.W.2d at 742.

Thus, the question regarding the foreseeability of the killing was one for the jury to answer. Under the facts of this case, the verdict is easily sustained.

### III.

Appellant also argues that the trial court erred in refusing to submit to the jury the lesser included offenses of second-degree murder, first-degree manslaughter and second-degree manslaughter. Appellant submitted a written request for jury instructions on second-degree felony murder, first-degree manslaughter and second-degree manslaughter. The trial court refused the request and submitted only the following: Count I—murder in the first degree (premeditated) and the lesser included offense of murder in the second degree (intentional murder without premeditation); Count II—murder in the first degree (intentional aggravated robbery); Count III—murder in the first degree (intentional burglary).

Generally, the determination of which lesser offenses should be submitted to the jury lies within the trial court's exercise of its discretion. *Bellcourt v. State*, 390 N.W.2d 269, 273 (Minn.1986). In *State v. Leinweber*, 303 Minn. 414, 422, 228 N.W.2d 120, 125–26 (1975), the court established a two-part test for determining when a lesser included offense must be submitted: (1) would the evidence reasonably support a conviction on the lesser offense and (2) would the evidence justify a finding of not guilty on the greater offense? *See also Bellcourt*, 390 N.W.2d at 273; *State v. Koop*, 380 N.W.2d 493, 494 (Minn.1986).

Initially, of course, the offense for which a defendant requests an instruction must be a lesser included offense of the crime charged. It is undisputed, and well-settled, that second-degree murder and both degrees of manslaughter are lesser included offenses of first-degree murder. *Bellcourt*, 390 N.W.2d at 273; *Leinweber*, 303 Minn. at 421, 228 N.W.2d at 125. Therefore, the only question is whether, under the foregoing standards enunciated by this court, the trial court erred in the exercise of its discretion in refusing to give the requested instructions.

### A. *Second–Degree Murder*

Minn.Stat. § 609.19(2) (1986) provides in relevant part:

Whoever does either of the following is guilty of murder in the second degree and may be sentenced to imprisonment for not more than 40 years:

\* \* \* \* \* \*

(2) Causes the death of a human being, without intent to effect the death of any person, while committing or attempting to commit a felony offense other than criminal sexual conduct in the first or second degree with force or violence.

The trial court refused to instruct on second-degree murder for either Count II or Count III, instead, giving jury instructions only for first-degree felony murder. The only relevant difference between first- and second-degree felony murder is whether or not the defendant had the requisite intent to cause the death. *Compare* Minn. Stat. § 609.185(3) (1986).

In the present case, there was no direct evidence of intent. No one who testified at appellant's trial was present when Robinson stabbed Enroth. Thus, appellant argues, the issue of intent was necessarily a fact question to be decided by the jury. By refusing to instruct the jury on second-degree murder, appellant contends, the trial court improperly directed a verdict on the key element of intent.

There is no direct evidence establishing Enroth's death as intentional. The state argues, however, that the expert testimony negates a reasonable conclusion that the death could have been negligent or accidental. Terry Laber, the BCA expert on blood spatter analysis, testified that the pattern of blood flow indicated that Enroth was stabbed either as he was being tipped over backwards in his wheelchair or while he was already flat on his back. He saw no defensive wounds on Enroth's body.

In addition, Dr. Roberta Zimmerman, the pathologist, concurred with Laber's conclusion that Enroth was either lying down or being tipped over when he was stabbed. Dr. Zimmerman, who performed the autopsy, described the wound as "extremely well placed," almost straight to the heart. In addition, Dr. Zimmerman testified that "a fair amount of force" was required to pierce 1 inch through the hard surface of the breast bone.

While there was no direct evidence that the killing was intentional, all of the expert testimony supports an inference of intentional, rather than accidental, killing. Appellant presented no evidence to controvert the experts' conclusions. In the present case then, there is no conflict in the evidence which would serve as a rational basis for acquitting appellant of the greater offense and convicting him of the lesser. The court has required that " 'proof of the elements which differentiate the two crimes must be sufficiently in dispute so that a jury' may make this distinction." *Bellcourt,* 390 N.W.2d at 273 (quoting *State v. Adams,* 295 N.W.2d 527, 532 (Minn.1980)).

Of course, a jury always possesses the power to acquit on the greater offense without any basis. However:

> The lesser-included offense charge is not required simply because the jury could exercise its power of acquitting on the greater charge for no reason at all 'in the teeth of both law and facts,' \* \* \*; there must be a rational basis for its doing so.

*Koop,* 380 N.W.2d at 494 (citation omitted).

■ Appellant can point to no evidence which is sufficient to bring the question of intent into serious dispute given the unrefuted expert testimony. Therefore, the trial court did not err in refusing to instruct the jury on the lesser offense of second-degree murder.

### B. *Manslaughter*

Minn.Stat. § 609.20(1) (1986) provides:

Whoever does any of the following is guilty of manslaughter in the first degree and may be sentenced to imprisonment for not more than 15 years or to payment of a fine of not more than $30,-000, or both: (1) Intentionally causes the death of another person in the heat of passion provoked by such words or acts of another as would provoke a person of ordinary self-control under like circumstances.

■ The trial court refused to instruct on either first-degree or second-degree manslaughter. Appellant argues, however, that the killing occurred in the heat of passion as a result of his rage over his belief that Enroth had raped Chamblee. However, the facts do not reasonably support a conviction on that charge.

The evidence established that Enroth was killed during the commission of an aggravated robbery. Appellant admits that, after entering the home, his intention was to rob Enroth supposedly to compensate Chamblee for her suffering after being raped. Enroth was killed either during or after the robbery. The only colorable issue in the case is whether or not the killing was intentional.

The question—whether the discovery, after leaving Enroth's presence, that his girl friend had allegedly been raped would be sufficient to justify an instruction for heat-of-passion manslaughter—was obviated by appellant's decision to rob Enroth. Thus, appellant's argument, in reality, is that the *robbery* was being committed in the heat of passion and that this rationale somehow transfers to the murder. Such an argument is completely without merit. In addition, it must be noted that the facts establish that Robinson, rather than appellant, did the actual killing. Again, even assuming that appellant's knowledge of the rape of his girl friend would provoke appellant to kill Enroth, Robinson had no similar provocation.

There are no facts in the record which would justify a jury in convicting appellant of manslaughter while acquitting him of first-degree murder. Thus, the trial court did not err in failing to instruct the jury on the lesser offense of manslaughter.

## IV.

Appellant also seeks review of the district court's denial of his petition for post-conviction relief. Appellant sought relief in the form of a new trial based on a claim of newly discovered evidence. The new evidence consists solely of an affidavit executed by appellant's accomplice, Kenneth Robinson, on December 3, 1987. Robinson's affidavit, in summary, states that he alone caused the death of Enroth in self-defense. Robinson claims that Merrill took no part in nor had knowledge of the killing. The trial court denied the petition, finding the evidence impeaching, cumulative and doubtful, and unlikely to produce a result more favorable to appellant.

To obtain a new trial on the basis of newly discovered evidence, the petitioner must establish, by a fair preponderance of the evidence, each of the following:

> (1) that the evidence was not known to him or his counsel at the time of trial, (2) that his failure to learn of it before trial was not due to lack of diligence, (3) that the evidence is material (or, as we have sometime said, is not impeaching, cumulative, or doubtful), and (4) that the evidence will probably produce either an acquittal at a retrial or a result more favorable to the petitioner.

*Race v. State,* 417 N.W.2d 264, 266 (Minn. 1987). *See also Berry v. State,* 364 N.W. 2d 795, 796 (Minn.1985); Minn.Stat. § 590.04, subd. 3 (1986). In addition, the decision, in the first instance, lies within the discretion of the trial court and will not be disturbed unless that discretion has been abused. *Race,* 417 N.W.2d at 266.

■ The trial court found that appellant failed to meet requirements (3) and (4) set out in *Race.* The court found the affidavit to be impeaching, cumulative and doubtful. In addition, the court found that the "new" evidence would not be likely to produce an acquittal or even a result more favorable to appellant. The trial court did a thorough and well-reasoned analysis of these two issues. We find no abuse of discretion and thus affirm.

## V.

■ Appellant's final argument is that the comments made by the prosecutor during closing argument constitute misconduct requiring a new trial. Appellant points to four specific statements which he claims deprived him of a fair trial.

First, during his closing argument, the prosecutor pointed to Enroth's empty

wheelchair and commented on the victim's inability to give his version of the facts. Appellant contends that this comment was designed to inflame the jury's passions. Appellant objected, but no corrective instruction was given.

Second, the prosecutor characterized appellant as "an animal." Appellant argues that this comment also constitutes misconduct because it was intended to appeal to the jury's passions and prejudices. It was also an improper expression of personal opinion by the prosecutor. Appellant objected and the trial court instructed the jury to rely on its own recollection of the evidence.

Third, the prosecutor referred to appellant's description of his prior felony convictions, comparing those descriptions to his version of the facts in the present case. The prosecutor also stated that the other witnesses had led crime-free lives. Appellant argues that the prosecutor attempted to use his prior felony convictions not to impeach his credibility, but to show his criminal disposition. In addition, he argues that there is no basis in the record for the references to the witnesses' crime-free backgrounds. Appellant objected and the jury was instructed again to rely only on its own recollections of the evidence.

Finally, appellant contends that the prosecutor attempted to divert the jury from its duty to decide the case solely on the evidence by injecting broader issues other than appellant's guilt or innocence. The objectionable comments are as follows:

Ladies and gentlemen, under our judicial system we call upon you, as jurors, private citizens of our area, to decide what kind of behavior are we going to put up with. We ask that you pass a message on to Michael Merrill that we don't approve of vigilante-type of [sic] justice here. We don't approve of the Michael Merrills of this world coming in and deciding—[objection]

\* \* \* \* \* \*

Michael Merrill just went back to Clifford's house and took the law into his own hands, decided it and performed all the functions of the criminal justice system all by himself there in a short period of time, in a matter of a few moments.

At that point, after Michael Merrill did that, the Enroth family would have been very justified in showing Michael Merrill the same degree of compassion, mercy and understanding that he showed to Clifford Enroth during the early morning hours of August 6, 1986. Because what Michael Merrill did to Clifford Enroth amounted to taking what was a normal, living human being and turning him into this [showing photograph], all because he felt he was justified in doing that.

Certainly, ladies and gentlemen, as I stated, the Enroth family could have felt justified in the same course of action. But they didn't do that. They submitted the case to law enforcement officers. They believed in our system. They followed our system. They came into this trial. They testified on the witness stand. [objection]

\* \* \* \* \* \*

The point being this, ladies and gentlemen: this case of Michael Merrill was turned over as a part of the system. The Enroths came in and testified at trial. They didn't feel justified in taking it into their own hands, and they didn't do that, because that wasn't right, and clearly they would not be justified in doing that. Instead, they believed in the system. They followed the system. And I ask, ladies and gentlemen, in your verdict, to show them that the system works.

Appellant objected and subsequently moved for a new trial. The motion was denied. However, a cautionary instruction was given to the jury. On appeal, appellant alleges that the trial court erred in refusing to grant his motion for a new trial.

We agree that the comments of the prosecutor referred to above were unfortunate, inexplicable, and, even worse, totally unnecessary. The prosecution had overwhelming evidence of defendant's guilt. It did not have to stoop to such tactics to get a conviction. We feel compelled to say that this court has seen with increasing fre-

quency tactics being used such as those exhibited in this case. All too many of these cases arise out of St. Louis County. *See, e.g., State v. Race,* 383 N.W.2d 656 (Minn.1986); *State v. Caldwell,* 322 N.W.2d 574 (Minn.1982); *State v. Wahlberg,* 296 N.W.2d 408 (Minn.1980). We have on occasion warned the prosecution in our opinions that it has used improper tactics. However, these warnings appear to have been to no avail. For example, at oral argument in this case, the prosecutor made a cynical statement to this court that, while it considered the tactics used here to be appropriate, even if the tactics had been inappropriate, the court should find the remarks non-prejudicial. We reiterate that we find the statements above cited deplorable. Were the evidence of guilt not so overwhelming in this case, we would not hesitate to send the case back for a new trial; however, we could not in good conscience find that the statements had any effect on the jury. That makes the use of those statements even more regrettable—because they were unnecessary.

We thus specifically warn St. Louis County and prosecutors generally for the last time that we will no longer tolerate the tactics used by the prosecution in closing arguments in this case. The prosecution can expect a reversal if such tactics are used again.

The trial court and the conviction are affirmed.