**STATE of Minnesota, Respondent,**

v.

**Herbert Alfred KELLY, Appellant.**

No. CX–88–380.

Supreme Court of Minnesota.

Feb. 17, 1989.

Bradford W. Colbert, Asst. State Public Defender, Minneapolis, for appellant.

Thomas L. Johnson, Hennepin County Atty., Minneapolis, for respondent.

## POPOVICH, Chief Justice.

Defendant was convicted of first-degree murder in a jury trial in Hennepin County District Court. Defendant appeals, claiming (1) the trial court committed reversible error by not instructing the jury on first degree (heat of passion) manslaughter; (2) defendant was denied his constitutional right to present a defense where the trial court prohibited defendant's character witnesses from testifying about their reaction to the criminal charges filed against defendant; and (3) statements made by defendant while officers were executing a search warrant in his apartment should have been suppressed. We affirm.

### I.

Around 1:30 or 2:00 a.m. on August 9, 1986, Adrian (Andy) Morrison, 17 (the victim), and Rex Basswood, 19, left a friend's house in Minneapolis and walked to a party they had spotted earlier on 19th Street and Park Avenue. Since they were underage, the partygoers would not let them in. However, they managed to sneak a few beers from a keg at the side of the house. After leaving the party they decided to steal a car radio. At 16th Street, the boys turned into an alley running between Park and Portland Avenues and entered a parking lot behind a building at 629 East 15th Street.

The boys tried to break into a 1978 Pontiac owned by defendant, Herbert Kelly. Defendant had installed an anti-theft device in the car after it had twice been stolen from this parking area. The beeper device, which the owner can carry with him, is activated when anyone tampers with the car.

At about 4:00 a.m. as the boys began trying to pry open the Pontiac's passenger window with a screwdriver, defendant's beeper went off. He decided to investigate, taking his gun with him. The gun was loaded when he went outside. Defendant came out the back door of the apartment building and shouted, "What are you guys doing?" Both boys began running. Basswood testified he took about three steps when he heard shots being fired. A neighbor also testified he heard six "explosions" coming from behind the building around this time. The boys split up and Basswood raced across Park Avenue, and down 16th Street toward Chicago Avenue.

Defendant watched the boys running away and noticed one of them had disappeared behind a hill after crossing Park Avenue. He followed that boy, Morrison, until he saw him run toward a patio area in the direction of 16th Street. He also noticed a bench there. He proceeded to a hill overlooking the patio area and the bench,

under which Morrison apparently was hiding.

Defendant reached the top of the hill and stopped approximately 3–5 feet west of the bench. He placed a bag of bullets on the ground at his feet. He tried to fire the gun at the bench but failed. He emptied the six spent cartridge casings and reloaded the gun, taking bullets from the bag and putting them into the revolver. It took about thirty seconds for defendant to reload the gun. A passerby, Robert Rickey, asked defendant what was going on, but got no response. Defendant then stepped up to the area of the bench, squatted down and began to fire the weapon. He fired three shots, repositioning himself after each shot. Rickey testified the defendant appeared to be very calm and cool about what he was doing. Defendant then left the area and went back the way he had come. Rickey went home and called the police.

Defendant testified he thought one of the boys was hiding under the bench. He said he had asked whoever was under the bench to come out, but received no response. This testimony conflicts with that of Rickey, who testified he never heard defendant say anything. Defendant also testified that although he saw another man walk by while he was reloading the gun, he did not respond because he was concentrating on what he was doing.

Officer Jeffrey Hoberg responded to Rickey's call. He went to the area but did not see any Black or Indian males, as described by Rickey. Basswood had also returned to the area with a friend. He called out Morrison's name from the top of a hill near where the body was later found, but heard no response. He never looked under the park bench.

Morrison's body lay undetected until approximately 8:00 a.m. on August 9 when the police received a call from a resident of a senior citizen complex near the park. The police found six spent cartridge casings on a grassy hill near the bench. The police also removed three bullets, two located in the bench itself and one on the ground near Morrison's head. There were bullet holes in Morrison's shirt and trousers.

The Hennepin County Medical Examiner examined the body and identified the cause of death as a gunshot wound to the chest which struck the aorta and caused a large blood loss into the chest area. Morrison also suffered another gunshot wound which entered his body in the left buttocks area and lodged near the liver. The medical examiner estimated neither of the wounds was made from a distance nearer than 18 inches. Morrison's blood revealed an alcohol concentration of .19.

Early in the morning on August 10, Basswood learned from a friend that an Indian boy had been shot at 16th and Park. He called the police and related the events that occurred during the morning of August 9. He identified a picture of the victim as Andy Morrison. He went with a police officer to trace his path of that night. While doing so he pointed out a 1978 Pontiac parked behind 629 E. 15th Street.

Detective Sergeant Roger Gates spoke with defendant at 12:10 p.m. on August 10. He told defendant he was investigating a death and believed the victim had attempted to break into defendant's car early on the morning of August 9. Defendant said he had no knowledge of the break-in, had used the car since that time, and had seen no evidence of any tampering. Gates asked defendant if he used the car that evening. Defendant said he had and returned home around midnight, parking the car at the rear of the building. When asked if he had been out again that night, he first answered no and then changed his mind and said he might have taken the garbage out sometime after returning home.

Sergeant Gates went back to the apartment approximately 45 minutes later after he learned defendant had reported his car stolen on one prior occasion. Defendant indicated the car had been damaged as a result of that theft and things were missing when it was returned. Gates also asked defendant if he owned a handgun. Defendant told him he used to own

a .38–caliber revolver. When defendant became reluctant to answer further questions, Officer Gates left. Gates never placed defendant under arrest and never advised him of any *Miranda* rights.

Lieutenant David Patten obtained a search warrant authorizing him to search defendant's car, apartment and storage area for a .38–caliber gun and a screwdriver. The warrant was executed on August 10 at 5:25 p.m.. Four other police officers accompanied Patten to defendant's apartment. Patten knocked on the door and was admitted by defendant. The warrant was delivered to defendant personally and he was present throughout the search. Patten told defendant they were there to look for a gun and asked if there were any guns in the house. Defendant said no. Patten told defendant they would be searching the whole apartment and it would be simpler if there were a gun in the apartment for defendant to point it out. Defendant again indicated there was no gun. Patten then had the defendant sit down at the kitchen table. He told him he wanted to talk to him about the murder which he had discussed with another police officer earlier in the day. Patten then advised defendant of his constitutional *Miranda* rights. At this point Patten asked defendant about his background, including his education and employment.

While Lieutenant Patten was discussing these things with defendant, Sergeant Johnson found a .38–caliber revolver in a brown bag inside a box in a hall closet. Johnson also found some shells lying in a plastic bag with the revolver. Patten then told defendant he was under arrest and would be taken to jail. He again sat down with defendant at the kitchen table and asked him if there was anything he wanted to tell him about the shooting. Defendant said there was "nothing to tell." Patten told defendant there was a witness to the shooting who would be shown his photograph. He also told defendant the spent cartridge shells and the bullets found at

the scene would be compared with the gun. Defendant did not respond. Patten then asked defendant if he had shot the boy after catching him in the act of breaking into his car. Defendant said, "I wouldn't do anything like that." Patten asked defendant if this meant he was denying shooting Morrison. Defendant did not respond. He asked defendant if the gun was stolen. Defendant said, "It better not be." Patten asked defendant if the gun had been in his sole possession the last three days and defendant said, "Yes." Patten again asked defendant if there was anything he would like to tell him about the shooting. Defendant said, "There is nothing to tell." Defendant was then taken down to city hall.

Drake Powers, a firearms examiner with the Minneapolis Police Department, conducted ballistics tests on the gun found in defendant's apartment. He found the gun had been fired within one week of his examination of the weapon on August 11, 1986. At least six shots had been fired from it. All six empty cartridges found near Morrison's body had been fired by defendant's gun. All of the bullets found at the scene, with the exception of one heavily damaged bullet found in the bench which was unidentifiable, were fired from defendant's gun. The one fingerprint found on the gun was defendant's.

## II.

Defendant argues the judge's refusal to instruct the jury on first degree (heat of passion) manslaughter,[1] Minn.Stat. § 609.20(1) (1986), constituted reversible error. Manslaughter in the first degree is defined as:

> Whoever * * * intentionally causes the death of another person in the heat of passion provoked by such words or acts of another as would provoke a person of ordinary self control under like circumstances.

1. Defendant also requested lesser included instructions on second degree intentional murder, Minn.Stat. § 609.19(1) (1986), second degree felony murder, Minn.Stat. § 609.19(2) (1986), and

second degree culpable negligence manslaughter, Minn.Stat. § 609.205(1) (1986). The jury was instructed on these offenses.

Minn.Stat. § 609.20(1). An intentional killing may be mitigated to first degree manslaughter if two elements are present: (1) the killing must be done in the heat of passion, and (2) the passion must have been provoked by words and acts of another such as would provoke a person of ordinary self-control under like circumstances. *State v. Boyce*, 284 Minn. 242, 254, 170 N.W.2d 104, 112 (1969); *see* Minn.Stat. § 609.20(1) (1986); *State v. Richardson*, 393 N.W.2d 657, 663 (Minn.1986).

In *State v. Lee*, 282 N.W.2d 896 (Minn.1979), this court set forth a test governing the submission of lesser included offenses:

> The test for determining whether lesser included degrees of a crime are to be submitted to a jury is: (1) whether the evidence would reasonably support a conviction of the lesser crime, and (2) whether the evidence would also support a finding of not guilty of the greater crime.

*Id.* at 899. "The determination of what, if any, lesser offense to submit to the jury lies within the sound discretion of the trial court [citations omitted], but where the evidence warrants an instruction, the trial court must give it." *Bellcourt v. State*, 390 N.W.2d 269, 273 (Minn.1986). Failure to give an appropriate instruction is a ground for reversal only if the defendant is prejudiced thereby. *Id.*

The trial court focused on the second, objective portion of the heat of passion test. The court ruled there was no need to instruct the jury on first degree manslaughter, since "on the facts of this case there is not sufficient provocation as a matter of law." We agree with the trial court's ruling since the evidence presented in this case does not reasonably support a conviction of defendant on the crime of first degree manslaughter.

Defendant argues he was afraid when he became aware that someone was breaking into his car. However, the mere fact someone attempted to steal defendant's automobile is not sufficient provocation to support a finding of first degree (heat of passion) manslaughter. Defendant was safely in his apartment when he was alerted by his beeper mechanism. Defendant could have called the police, but instead decided to investigate on his own. He spotted the boys near the car and began shooting at them while they were running away. Instead of returning to his apartment, defendant chased one of the boys until he saw him enter a park. Although defendant argues he was afraid, there is no evidence he was ever threatened by Morrison. In addition, defendant made no effort to seek help from a passerby, Robert Rickey, who questioned defendant about his actions. Although defendant was unaware of the whereabouts of the other car thief and testified he was afraid, he did not feel compelled to draw his gun on Rickey or ask him to identify himself.

Defendant argues that under these circumstances he felt provoked enough to fire at least three shots, at fairly close range, directly at the area under the bench. We believe the evidence would not reasonably support a finding that a person of ordinary self control would be provoked under like circumstances. The trial court did not abuse its discretion in failing to instruct the jury on first degree manslaughter.

### III.

Defendant argues the trial court's failure to allow defendant's character witnesses to testify regarding their reaction to the charges brought against defendant constituted reversible error. Defendant presented ten character witnesses who testified as to his good character and reputation for honesty and peacefulness. These witnesses consisted of friends, relatives and co-workers. Defendant's attorney was allowed to question these character witnesses extensively regarding defendant's background, education, employment record, etc. However, when defendant's mother, Hazel Kelly, was asked, "What did you think, Mrs. Kelly, when you heard that your son had been charged with first degree murder?" the State objected and the trial court sustained the objection. We find the trial court's ruling constituted harmless error.

Appellate courts largely defer to the trial court's exercise of discretion in evidentiary matters and will not lightly overturn a trial court's evidentiary ruling. *See, e.g., State v. Brouillette,* 286 N.W.2d 702, 707 (Minn. 1979); *State v. Swain,* 269 N.W.2d 707, 714 (Minn.1978). Absent a clear abuse of discretion, the ruling will stand. *State v. Jones,* 347 N.W.2d 796, 802 (Minn.1984). If exclusion of the evidence did violate defendant's constitutional right to present a defense, the decision will not be reversed if it is found to be harmless beyond a reasonable doubt. *See State v. Larson,* 389 N.W. 2d 872, 875 (Minn.1986) (citing *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967)). A ruling is prejudicial and therefore reversible if there is a reasonable possibility the error complained of may have contributed to the conviction. *Id.*

Defendant relies on the case of *State v. Hodges,* 384 N.W.2d 175 (Minn.App.), *aff'd on other grounds,* 386 N.W.2d 709 (Minn. 1986). Assuming, without deciding, that defendant's proffered character evidence was improperly excluded by the trial court, it is clear that the exclusion of this evidence constituted harmless error. Each of defendant's character witnesses provided strong opinions regarding defendant's reputation in the community for honesty and peacefulness. An answer to the additional question regarding the witness' reaction to the charges brought against defendant would have been of slight probative value. The witnesses were asked if their opinion of defendant's honesty and truthfulness would change if they knew that defendant owned a gun and had lied to police on three occasions. Each witness answered no. The jury was well aware the charges brought against defendant were inconsistent with the opinion of defendant held by each of these witnesses. Thus the error is harmless.

## IV.

Defendant argues the trial court committed reversible error when it failed to suppress statements made by defendant to police at his apartment prior to being informed of his *Miranda* rights. We hold the statements made by defendant prior to receiving a *Miranda* warning should have been suppressed, but the admission of such statements in this case for impeachment purposes does not constitute reversible error.

In *Miranda v. Arizona,* the United States Supreme Court stressed the importance of excluding statements made "in custody" without the proper warnings:

> [W]ithout proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.

384 U.S. 436, 467, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694 (1966). *Miranda* warnings are only required when restrictions on a person's freedom create the type of environment which renders him "in custody." *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977). In *State v. Palm,* 299 N.W.2d 740 (Minn.1980), this court set forth a standard for determining the admissability of in-home, pre-arrest statements. The court stated a determination must be made whether the defendant "reasonably believe[d] that his freedom of action was restricted in any significant way while he was being questioned." *Id.* at 742. On review this court must examine whether the trial court "clearly erred in determining that [defendant] did not reasonably believe his freedom of action was restricted in any significant way while the warrant was being executed." *State v. Bekkerus,* 297 N.W.2d 136, 138 (Minn.1980).

Under the *Palm* standard, we find the defendant could have reasonably believed that his freedom of action was restricted while being questioned. Although it is not clear whether defendant was told directly not to leave the apartment, he was surrounded by five police officers, his daughter was still in the apartment, and since it was his home he had a strong motive to remain there while others were present.

The State argues the defendant's statements could nonetheless be admitted for impeachment purposes. The only statement made by defendant, prior to receiving a *Miranda* warning, was his claim there was no weapon in the apartment. Once Lieutenant Patten told defendant that he would like to discuss the murder which defendant had previously talked with Officer Gates about, defendant was informed of his *Miranda* rights. We examined the use of pre-*Miranda* statements for impeachment purposes in *State v. Clark*, 296 N.W.2d 359 (Minn.1980):

> While *Miranda* bars the prosecution from making its case with statements of an accused made during a custodial interrogation without first effectively waiving constitutional rights, it does not preclude use of such statements for impeachment purposes so long as the statements are voluntary and trustworthy.

*Id.* at 367 (citations omitted). In this matter the police had a valid warrant to search the apartment. The statements by defendant went only to his credibility since he did not relate any details of the crime which would have been incriminating. We therefore hold the limited use of the statements for impeachment purposes did not constitute reversible error.

AFFIRMED.

KEITH, Justice, took no part in the consideration or decision of this case.