STATE of Minnesota, Respondent,

v.

Ronald Siebelt GOLDENSTEIN, Appellant (C8–92–1273),

Paulene Evelyn Goldenstein, Appellant (C5–92–1277).

Nos. C8–92–1273 and C5–92–1277.

Court of Appeals of Minnesota.

Aug. 17, 1993.

Review Denied Oct. 19, 1993.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Michael O. Freeman, Hennepin County Atty., Michael Richardson, Asst. County Atty., Minneapolis, for respondent.

John M. Stuart, State Public Defender, Cathryn Middlebrook, Asst. Public Defender, Minneapolis, for appellants.

Considered and decided by DAVIES, P.J., HUSPENI, and HARTEN, JJ.

## OPINION

HUSPENI, Judge.

This appeal involves the criminal convictions of appellants, Paulene and Ronald Goldenstein, who allegedly sexually abused their three foster children from May 1987 through May 1990. Following a joint jury trial, Paulene and Ronald Goldenstein were convicted of criminal sexual conduct in the first degree in violation of Minn.Stat. § 609.342, subd. 1(a) (1990)[1] and Ronald Goldenstein was also convicted of criminal sexual conduct in the second degree in violation of Minn.Stat. § 609.343, subd. 1(a) (1990).[2] The trial court, imposing upward durational departures from the August 1, 1989, sentencing guidelines, sentenced each appellant to 120 months for the first degree convictions and Ronald Goldenstein to an additional 21–month stayed consecutive sentence for criminal sexual conduct in the second degree.

Appellants challenge their convictions on the grounds that (1) they were denied their constitutional right to present evidence in support of their defense; (2) admission of hearsay evidence violated their constitutional right to confront their accusers; (3) the trial court erred in prohibiting the defense access to portions of privileged or confidential materials; (4) the trial court's evidentiary rulings and prosecutorial misconduct denied them a fair trial; (5) the evidence was insufficient to support the convictions; and (6) the trial court erred in sentencing them under the

---

1. A person who engages in sexual penetration with another person is guilty of criminal sexual conduct in the first degree if * * *

 (a) the complainant is under 13 years of age and the actor is more than 36 months older than the complainant.

 Minn.Stat. § 609.342, subd. 1 (1990).

2. A person who engages in sexual contact with another person is guilty of criminal sexual conduct in the second degree if * * *

 (a) the complainant is under 13 years of age and the actor is more than 36 months older than the complainant.

 Minn.Stat. § 609.343, subd. 1 (1990).

August 1, 1989, sentencing guidelines. We reverse and remand for a new trial.

### FACTS

In 1987, Hennepin County placed three Native American siblings, D.P., then four-and-one-half years old, her brother, W.P., then three-and-one-half years old, and their sister C.R., then 22 months old,[3] in the foster care of appellants, Paulene and Ronald Goldenstein. The county informed appellants that the three children were neglected and possibly abused by their biological mother, who had a severe alcohol problem. Appellants, who previously had been foster parents to six children at various times, were initially hesitant to take the children but agreed after recognizing that the children needed a home.

In 1986, before placement of the children in appellants' home, the biological mother left the children home alone and unsupervised. Police found two of the children on the roof and the third naked in the alley. After the biological mother abandoned the children in March 1987, the children were found outside, one in urine-soaked underwear. Their housing lacked heat and electricity and was extremely unsanitary. Child protection placed the children in a shelter.

On April 27, 1987, the older girl was placed in appellants' home; the younger girl was placed there two days later. The boy was placed there on May 11, 1987. On May 7, 1990, the older girl reported to her day care provider that Ronald Goldenstein had hit her. Appellants allegedly sent the older girl, who apparently was acting inappropriately in a store, to sit alone in appellants' truck while the others finished shopping. Ronald Goldenstein allegedly struck the older girl after appellants returned to the truck and found that the older girl had started a fire in the truck. Child protection removed the children from appellants' home on May 10, 1990, and commenced an investigation. A finding of physical maltreatment and neglect was subsequently made and Hennepin County revoked appellants' foster care license.

According to Paulene Goldenstein, the children exhibited inappropriate sexual behavior immediately after their placement in appellants' home. Paulene Goldenstein testified that the older girl masturbated the first night in appellants' home and that the boy touched or attempted to touch Paulene Goldenstein's breasts. She also initially observed that the children were hyperactive and would strike, kick, and bite each other. Paulene Goldenstein discussed the sexual and aggressive behavior with the children's social worker at that time and attempted to get the children into therapy.

Many of appellants' witnesses, including prior social workers, a day care provider, family members, and coworkers, testified that the three children presented multiple challenges for appellants from the start. For example, a day care provider testified that on the first day she cared for the children, the boy climbed on her lap and touched her breasts. She stated that she often found the older girl in the bathroom masturbating and that the younger girl often played sexually. Similarly, a coworker testified that while at appellants' home for dinner with the family, she and Paulene Goldenstein found the older girl on the bed "humping" the coworker's son. Barbara Dickenson, the social worker from 1987 to 1988, testified that Paulene Goldenstein reported to her that the children acted out sexually, such as the older girl masturbating or mimicking sexual intercourse, or the boy touching Paulene Goldenstein's breasts. Dickenson and another of the children's social workers testified that appellants were fit foster parents.

The children received therapy while in appellants' foster care. According to the therapists, the children never specifically indicated that appellants were sexually abusing them. Dr. Darlene Sholtis, the boy's therapist from December 1989 through August 1990, testified that she administered a battery of tests. On the Bene–Anthony Family Relations Test, the boy responded "mom [Paulene Goldenstein]" to the questions "[t]his person is nice," "[t]his person is nice to me," and

---

**3.** Hereafter in this opinion, to facilitate identification, D.P. shall be described as the older girl; W.P. as the boy; and C.R. as the younger girl.

"[t]his person helps me." Regarding bad touch, Dr. Sholtis testified that the boy told her that the older girl and the younger girl touched his penis. Although the boy did not reveal any inappropriate sexual touching by appellants, Dr. Sholtis noted that the boy was reluctant to discuss inappropriate touches.

Beginning in January 1988, Ann Gearity began providing therapy to the older girl and worked on issues of sexual acting-out and aggressiveness. Gearity felt the older girl improved during therapy and would not have improved as much if she was being sexually abused during the therapy. The younger girl was assessed by Tom Breitenbucher. In administering the good touch/bad touch test, the younger girl identified "[the older girl] humps me" as a bad touch. The younger girl did not state Ronald Goldenstein touched her in a bad way, although Paulene Goldenstein was in the room while Breitenbucher administered the tests. Breitenbucher last saw the younger girl after the children were removed from appellants' home. He testified that the younger girl

> was not very happy to see me. She asked about Mrs. Goldenstein, if I had seen her, what had happened to her. It was pretty clear that she was afraid of me, angry with me. My interpretation was she associated me with being taken out of that home.

After their removal from appellants' home, the children were placed in the foster care of Sybil Gund on September 17, 1990. Gund was informed that the children were hyperactive and had come from a background including a chronically alcoholic mother. Approximately two weeks after the children came to her home, Gund noticed the children sexually acting out. The boy, for example, attempted to kiss another boy on the mouth. Gund also found the boy and the younger girl playing in the boy's room and both had their underpants down. According to Gund, the sexual acting out occurred "often enough" and was primarily instigated by the older girl.

While in Gund's home, the three children made statements that they had been sexually abused in appellants' home. The younger girl was the first to indicate she had been sexually abused. After explaining to the younger girl that she could not sleep in Gund's bed with her, the younger girl told Gund that she slept with Ronald and Paulene Goldenstein and that Ronald Goldenstein played with her "privates." According to Gund, the boy told her that he would take baths with Paulene Goldenstein and that she would play with him and "suck his privates." In another incident, Gund was playing a "boundary" game suggested by the children's counselors. Gund testified that during the game, the older girl ran from the room and came back crying "he hurt my privates." Gund asked the older girl who hurt her. The older girl responded "Ron Goldenstein." In a final incident, Gund testified as follows:

> We were having hot dogs for supper, hot dogs and polish sausages. [The older girl] was shoving those hot dogs and polish sausages in her mouth like she was sucking on them, and [the boy] said, "[The older girl], what are you doing, sucking on Ron Goldenstein," and [the older girl] got mad, and then she put her head down * * * and she said, "You big mouth." She said that [the boy] gave away her secret.

The boy also told Gund that he had seen appellants having sex with the older girl in the basement. Gund informed Ronald Spolar, who became the children's social worker in 1989, about the statements the children had made about sexual abuse.

On December 18, 1990, the three children were interviewed individually at Corner-House by Judy Weigman, an interviewing specialist. CornerHouse is a private independent agency that interviews victims of alleged child abuse who are referred from child protection and law enforcement. During the videotaped interviews, the boy and the younger girl both made statements indicating appellants had sexually abused them.

During his interview, the boy stated that Paulene Goldenstein entered his bedroom, undressed him and herself, and then "hugged" his "dick" with her hands while Ronald Goldenstein watched. The boy told the interviewer that Paulene Goldenstein laid him on the bed, and "humped" him. When Paulene Goldenstein "humped" the boy, she grabbed his hands and had him touch "her

boobs." The boy also stated that Paulene Goldenstein kissed him on the lips. During the interview, the boy also indicated that while Paulene Goldenstein "humped" him, his "dick" "went in her privates." He stated she "humped" him on ten occasions and sucked his private four times. The boy also testified that Paulene Goldenstein had him "suck her private":

Q. She did, huh? Did she get on top of you like that, or was there another way that you sucked her private?

A. Umm—her just got on my face and just—and I didn't like that either.

* * * * * *

Q. When mom got on your face like that, what did you do?

A. (No response.)

Q. What did you do, [boy]?

A. I didn't have any air.

* * * * * *

Q. Did you do anything with your mouth when mom was there?

A. I had my mouth closed.

Q. You had your mouth closed, huh? What did mom say when you had your mouth closed?

A. Her just put it right on my face.

In response to a leading question, the boy stated that Ronald Goldenstein took photographs during the sexual abuse. In addition to his statements about sexual abuse committed by Paulene Goldenstein, the boy also stated that a babysitter had sucked his private, "humped" him and had made him suck her private.

The younger girl, during her videotaped interview at CornerHouse, told the interviewer that Ronald Goldenstein hugged her and with his hand rubbed her butt and her "pee pee." She demonstrated with anatomically correct dolls how Ronald Goldenstein spread her legs and "put [his finger] in [her] private." The younger girl also indicated that Ronald Goldenstein put his penis in her private. The younger girl stated that Ronald Goldenstein got on her, "put it on [her]" and that it "hurted." Answering a leading question of whether she saw blood, the younger girl stated that Ronald Goldenstein had blood on his penis and it got on her stomach. The younger girl told the interviewer that Paulene Goldenstein saw the sexual activity and that Ronald Goldenstein would then "hump [her] sister." According to the younger girl, photographs were taken of the sexual abuse. At the close of the interview, the younger girl was asked if Paulene Goldenstein had done anything to anyone in the family. The younger girl said "no." The interviewer then asked "[w]hat about [the boy]?" The younger girl again said "no."

In her interview, the older girl denied that anyone had touched her privates or that anyone hurt her at appellants' home. She also denied that anyone hurt the boy or the younger girl. The older girl did state, in response to a question about staying at appellants' house, that "[she] hate[d] that house." She stated that Ronald Goldenstein was "naughty" but could not say why.

Subsequent to the interviews, all three children were examined by Dr. Marjorie Hogan. She testified that she records spontaneous utterances a child may make during an examination. When she examined the boy, he stated "someone hurt my privates." The examination of the boy resulted in no physical findings of sexual abuse. Dr. Hogan noted that her examination of the older girl showed some abnormalities of the vaginal area but that these were nonspecific findings consistent with sexual abuse. She could not conclude clinically that the older girl had been sexually abused. The medical examination of the younger girl indicated an irregularly shaped hymen, meaning "some sort of damage or trauma" to the hymen occurred, although the finding was nonspecific. In her assessment, Dr. Hogan stated that her "exam [of the younger girl] is consistent with sexual abuse."

After being removed from appellants' home, the three children began receiving therapy at Wilder Child Guidance Center. The two girls were referred to the center in January 1991 by their social worker for sexual acting-out, boundaries, impulse control, attention deficit hyperactivity disorder, and developmental delays. The older girl and the younger girl were seen by Nancy Westrell. Westrell noted that during her sessions with

the older girl and the younger girl, both "state[d] they were 'hurt' by Ron and Paulene [Goldenstein]." Westrell testified that both girls "seemed to have a very strong association and connection between what happened at what location and who they were living with."

Dr. Eugene Urbain began seeing the boy at Wilder in January 1991. Like his sisters, he was referred for impulse behavior, aggressive temper outbursts, inappropriate touching of his sisters, and difficulty with attention span in school. The boy made a spontaneous statement to Dr. Urbain that a babysitter had "humped" either him or one of his sisters. He also told Dr. Urbain that he had seen Ronald Goldenstein "humping" the older girl. According to Dr. Urbain, the boy indicated that social worker Ronald Spolar, appellants, and the children were present during the "humping." Dr. Urbain was unclear as to the frequency of sexual abuse and whether Ronald Spolar was in the home. However, Dr. Urbain indicated in his notes:

> [The boy] states that on at least one occasion he observed Ron Spolar kissing and humping [the older girl]. [The boy] stated it was real life and not a story that Ron Spolar was involved in kissing and humping [the older girl] at the Goldenstein home. At one point, I was confused about whether he was telling about Ron Goldenstein or Ron Spolar, but upon further questioning he continued to state that both Rons had been involved in the touching and humping with the kids. [The boy] demonstrated the humping with anatomically correct dolls in my office. [The boy] stated the persons present were Ron Spolar, the Goldensteins, himself, [the younger girl], and [the older girl].

Dr. Urbain wrote that this "[c]ould be a bombshell."

Subsequent to the statements implicating Ronald Spolar of sexually abusing the older girl and the younger girl, an investigation was commenced. The children were again interviewed at CornerHouse. The results of all three interviews "indicate[d] no sexual abuse" by Ronald Spolar.

Pursuant to a warrant, the police searched appellants' home in December 1990, seven months after the children were removed from the house. Among the items seized were three pornographic magazines, two of which were over 10 years old. One magazine, entitled "Little Darlings," depicted adult women as girls. The two other magazines were found in a cardboard box containing many other types of magazines. An officer testified that she found the "Little Darlings" magazine on a table next to a lounge chair in the basement family room. The officers also recovered old, yellowed photographs of appellants engaged in sexual acts with each other. The search, however, did not recover any photographs depicting children engaged in sexual acts with each other, appellants, or anyone else. The trial court made a pretrial ruling that the probative value of the pornography and photographs was substantially outweighed by their prejudicial effect and was thus not admissible in the state's case-in-chief, although "Little Darlings" would be admissible if appellants put their character in issue.

## ISSUES

1. Were appellants denied their constitutional right to present a defense?

2. Were appellants denied their constitutional right to confront their accusers by the trial court's rulings to admit the children's out-of-court statements?

3. Did the trial court, pursuant to in camera review of child protection records, abuse its discretion in determining that certain information was not relevant to the defense and consequently not discoverable?

4. Were appellants denied their constitutional right to a fair trial by the trial court's evidentiary rulings and by misconduct of the prosecutor?

5. Does sufficient evidence exist as a matter of law for a reasonable jury to find appellants guilty of criminal sexual conduct?

6. Did the trial court err in sentencing appellants under the sentencing guidelines effective August 1, 1989, which apply to offenses committed after that time, where the state prosecuted conduct allegedly occurring between May 1987 and May 1990 but failed

to present evidence establishing that the offense occurred after August 1, 1989?

## ANALYSIS

### I.

Every criminal defendant has a right to be treated with fundamental fairness and to be "afforded a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984), *quoted in State v. Richards*, 495 N.W.2d 187, 191 (Minn. 1992). The due process clauses of the federal and Minnesota state constitution require no less. *Richards*, 495 N.W.2d at 191. The right to present a defense includes the "right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967), *quoted in Richards*, 495 N.W.2d at 194.

> Appellate courts largely defer to the trial court's exercise of discretion in evidentiary matters and will not lightly overturn a trial court's evidentiary ruling.

*State v. Kelly*, 435 N.W.2d 807, 813 (Minn. 1989). "Absent a clear abuse of discretion, the ruling will stand." *Id.* If exclusion of evidence did violate defendant's right to present a defense, the appellate court will not reverse the decision if the error is found to be harmless beyond a reasonable doubt. *Id.*

Appellants claim three of the trial court's rulings excluding evidence denied them their constitutional right to present evidence in support of their defense: (A) the children's accusations that social worker Ronald Spolar sexually abused them; (B) the possibility that the children were exposed to a known sexual offender while in the biological mother's home; and (C) expert testimony relating to fetal alcohol syndrome (FAS).

### A.

■ Although the trial court permitted admission of evidence that the children stated social worker Ronald Spolar was present while appellants allegedly sexually abused them, the trial court excluded evidence that the children had accused Spolar of sexual abuse despite the trial court's findings that the allegations against Spolar were probably not true. With no physical evidence except medical evidence "consistent with" sexual abuse, the state's case rested nearly exclusively on the children's out-of-court statements. Consequently, the veracity of the children when making those statements was critical to appellants' defense. We agree with appellants that the trial court's exclusion of evidence of the prior false allegations violated their constitutional right to present a defense. *See Richards*, 495 N.W.2d at 191. We therefore reverse the convictions and remand for a new trial.

Evidence that the children stated that Spolar participated in the sexual abuse impacts the credibility of the children's out-of-court statements. Under current Minnesota law, we believe the prior false accusations are admissible to attack the credibility of the children's other statements. In *State v. Gerring*, 378 N.W.2d 94, 96–97 (Minn.App.1985), this court held that the trial court properly excluded evidence that the criminal sexual conduct victim previously had accused others of rape. This court determined that prior accusations of rape are relevant only to the victim's propensity to be truthful if there has been a determination that the prior accusations were indeed fabricated. *Id.* at 97.

We also find persuasive the rule of law established in several foreign jurisdictions whereby evidence of prior false accusations is admissible both to attack the credibility of the complainant and as substantive evidence tending to prove that the instant offense did not occur. *See Smith v. Georgia*, 259 Ga. 135, 377 S.E.2d 158, 160 (1989) (citing cases from Arkansas, California, Montana, and Virginia), *cert. denied* 493 U.S. 825, 110 S.Ct. 88, 107 L.Ed.2d 53 (1989). Those courts have reasoned that the evidentiary rule preventing evidence of specific acts of untruthfulness must yield to the defendant's right of confrontation and right to present a full defense. *Id.* Before evidence of prior false accusations is admissible, however, the trial court must first make a threshold determination outside the presence of the jury that a reasonable probability of falsity exists. *Id.*

## B.

Reversal and remand for a new trial obviates the necessity of addressing the additional issues raised by appellants. However, because of the likelihood that these issues will recur, we offer the following guidance to assist the court at retrial.

■ We disagree with appellants' argument that the exclusion of evidence from the child protection records that the children were allegedly exposed to a known sexual offender and may have been abused prior to their foster placement in appellants' home violated their constitutional right to present a defense. While we may have exercised our discretion differently had we been the trial court, our standard of review requires us to affirm on this issue. *See Kelly*, 435 N.W.2d at 813.

The supreme court has held that despite the prohibition of the rape shield laws,

a trial court has discretion to admit evidence tending to establish a source of knowledge of or familiarity with sexual matters in circumstances where the jury otherwise would likely infer that the defendant was the source of the knowledge.

*State v. Benedict*, 397 N.W.2d 337, 341 (Minn. 1986). The trial court, however, must balance the probative value° of the evidence against its potential for causing unfair prejudice. *Id.*

Appellants testified that the children sexually acted-out immediately after placement in their home. This evidence was corroborated by family members and friends who witnessed the children's inappropriate sexual behavior early on and leads to an inference the children had previous sexual interaction. Furthermore, the stipulated facts, although not specifically addressing potential sexual abuse while in the biological mother's care, did indicate severe neglect and maltreatment. This evidence provided appellants with an opportunity to argue prior source of knowledge. *See id.* However, the child protection records do not provide any basis to conclude that the children were exposed to the known offender.[4] Consequently, the exclusion of the evidence was within the trial court's discretion. *See Kelly*, 435 N.W.2d at 813.

## C.

■ Appellants also allege that the denial of their motion to permit an expert to testify regarding FAS prohibited them from presenting evidence in their defense as constitutionally required. We agree.

A decision whether to admit expert testimony rests in the sound discretion of the trial court and an appellate court will not reverse a trial court's determination unless there is an abuse of that discretion. *State v.*

---

4. In response to the prosecutor's question to Ronald Spolar as to whether the child protection records as of early 1987 indicated the children had been sexually abused, Spolar stated:

No. From the records, there was nothing documented to indicate that the children were sexually acting out prior to their placement. There were fetal alcohol concerns, behavioral concerns, growing concerns, and so forth.

Appellants' concern lies with the exclusion of the child protection records indicating the children's older brother had been sexually abused. The records were made available to appellants' counsel pursuant to the trial court's in camera review under *State v. Paradee*, 403 N.W.2d 640, 642 (Minn.1987). The records show that in June 1986, child protection conducted a sexual abuse assessment of the children's older brother after the county was made aware that a known sexual offender had befriended him. Records of the assessment indicate that the sexual offender made pornography accessible to the older brother, that he videotaped sexual contact between the

older brother's cousin and another male, that he showed these videotaped encounters to the older brother, that the sexual offender "hugged and kissed" the older brother, and that the sexual offender told his cousin to "suck on [the other male's] dick." The records indicate that the older brother at the time lived with the biological grandmother, not with the biological mother and the children in this case. In late July 1986, child protection again assessed the older brother after the older brother had been "on the run" with the sexual offender for a week. Again, the records show that the older brother resided with the biological grandmother. The records contain no evidence that the children involved in this case had contact with their brother or the sexual offender.

We assume that discovery conducted pursuant to the child protection records would have revealed admissible evidence of contact between the sexual offender and these children, or to evidence of inappropriate sexual behavior between them and the older brother if such evidence existed.

*Myers,* 359 N.W.2d 604, 609 (Minn.1984). Expert testimony is admissible pursuant to Minn.R.Evid. 702,[5] the basic consideration of which is whether the evidence will assist the jury in resolving the factual question at issue. *Id.*

Appellants wanted to call Dr. Robert W. ten Bensel to testify as to FAS and the impact the disease has on children's behavior and their ability to remember and describe events. The trial court excluded Dr. ten Bensel's testimony because he could not, based upon the records before him,[6] diagnose that the children had FAS. The trial court also excluded the testimony because appellants' expert had not interviewed or examined the children, although the court by its own order had prohibited such an examination. Apparently, in the medical records, disclosed subsequent to the court's ruling prohibiting expert testimony on FAS, the children were diagnosed with FAS.

The admissible evidence at trial, especially the evidence from the medical and psychological professionals, often touched on FAS. The jury was never provided with information about the syndrome. The state contends that information about FAS is not relevant to the case and has no bearing on whether the children were sexually abused. FAS, however, apparently impacts a child's ability to remember and restate events. If

medical records do, in fact, contain a FAS diagnosis of the children, this medical information directly affects the credibility of the children, would be helpful to the defense, and the expert testimony would assist the jury in discharging its fact finding duty. Subject to verification of a FAS diagnosis, expert testimony on this syndrome should be admitted on retrial.

## II.

■ The trial court conducted a competency hearing with each child in chambers. *See* Minn.Stat. § 595.02, subd. 1(*l*) (1990) (child less than ten is competent to testify unless the court finds the child lacks the capacity to remember or to relate facts truthfully); *State v. Lanam,* 459 N.W.2d 656, 660 (Minn.1990) (in competency hearing, trial court must determine whether the child has an ability to understand, to be truthful, and to remember and relate events), *cert. denied* 498 U.S. 1033, 111 S.Ct. 693, 112 L.Ed.2d 684 (1991). Under Minnesota law, children are presumed competent to testify unless the contrary is shown. *State v. Scott,* 501 N.W.2d 608, 613 (Minn.1993). The trial court determined that all three children were incompetent to testify and admitted the out-of-court statements as substantive evidence.[7] *See* Minn.Stat. § 595.02, subd. 3 (1990).[8]

---

5. Minn.R.Evid. 702 provides as follows:
 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
 The United States Supreme Court has held that Fed.R.Evid. 702 overruled the "general acceptance" test of *Frye v. United States,* 293 F. 1013, 1014 (D.C.Cir.1923). *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* — U.S. —, —, 113 S.Ct. 2786, 2793, 125 L.Ed.2d 469 (1993). This court recently considered the persuasiveness of *Daubert* but declined to expressly adopt the test enunciated by the Court for the federal rule on expert testimony. *State v. Alt,* 504 N.W.2d 38, 46 n. 11 (Minn.App.1993).

6. During trial, the prosecution learned that Westrell and Dr. Urbain, the children's therapists at Wilder, had not produced the complete record of the children prior to trial. The mistake apparently was inadvertent and additional records were provided one day prior to the therapists'

testimony. However, it appears an additional mistake was made, again producing more records the day the therapists testified. The trial court permitted the therapists to testify as to the records produced through the day before the testimony, but not as to the records produced that day.

7. The trial court found the older girl incompetent on the basis of lack of ability to tell the truth and the younger girl incompetent on the basis of her lack of ability to remember what happened. The trial court found the boy incompetent because he refused to answer questions and was frightened.

8. An out-of-court statement made by a child under the age of ten years * * * alleging, explaining, denying, or describing any act of sexual contact or penetration performed with or on the child * * * is admissible as substantive evidence if:
 (a) the court * * * finds, in a hearing conducted outside the presence of the jury, that the time content, and circumstances of the statement and the reliability of the person to

Appellants contend admission of the children's out-of-court statements denied them the constitutional right to confront their accusers. *See* U.S. Const. amend. VI (confrontation clause). We disagree.

■ We accept the Eighth Circuit's recent determination that out-of-court statements admitted under Minn.Stat. § 595.02, subd. 3 do not fall into a "firmly rooted" hearsay exception. *Ring v. Erickson,* 983 F.2d 818, 821 (8th Cir.1993).[9] Statements admitted under other hearsay exceptions satisfy the confrontation clause reliability requirement only if the state establishes that the totality of the circumstances surrounding the making of the statements exhibit "a showing of particularized guarantees of trustworthiness." *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980), *quoted in Idaho v. Wright,* 497 U.S. 805, 816, 110 S.Ct. 3139, 3147, 111 L.Ed.2d 638 (1990).

■ The issue of whether the confrontation clauses of the federal and state constitutions were violated, therefore, depends upon whether the children's out-of-court statements show "particularized guarantees of trustworthiness." The trustworthiness of the statements depends on the circumstances surrounding the making of the statement, not the evidence corroborating the statement. *State v. Edwards,* 485 N.W.2d 911, 915 (Minn.1992) (citing *Wright,* 497 U.S. at 819, 110 S.Ct. at 3148–49). Under *Wright,* those circumstances include:

> whether the statements were spontaneous, whether the person talking with the child had a preconceived idea of what the child should say, whether the statements were in response to leading or suggestive questions, whether the child had any apparent motive to fabricate, and whether the state-

ments are the type of statements one would expect a child of that age to fabricate.

*Lanam,* 459 N.W.2d at 661 (citing *Wright,* 497 U.S. at 820–25, 110 S.Ct. at 3149–52). The court should also consider whether the children's statements were made with consistent repetition during the same interview or conversation. *Edwards,* 485 N.W.2d at 916.

■ The statements the boy and the younger girl made to Gund were spontaneous and not in response to leading questions. Likewise, Gund had no preconceived idea that the younger girl, after Gund told her she must sleep in her own bed, would comment on behavior of the appellants. Also, the boy's statement to the older girl when she was eating the polish sausages was spontaneous. Nothing in the record provides a factual basis on which to conclude Gund had a motive to falsely implicate appellants. *See Lanam,* 459 N.W.2d at 661 (foster mother to whom statement was made had no motive to falsely implicate defendant). Although the record is silent on whether the children were interviewed about abuse at appellants' home before their placement with Gund, Gund's report to the social worker apparently led to the commencement of the sexual abuse investigation. We conclude, therefore, that the children's out-of-court statements to Gund exhibit sufficient trustworthiness. *See id.*

■ The statements of the children made during the CornerHouse interviews present more difficulties. Nonetheless, we conclude that these statements also were constitutionally trustworthy and their admission did not violate the confrontation clause. *See id.* Appellants rely heavily on the children's below-average functioning, symptoms of attention deficit hyperactivity disorder and FAS to claim the children were no more capable of accurately relating events at the interview

---

whom the statement is made provide *sufficient indicia of reliability;* and
(b) the child * * * (ii) is *unavailable as a witness and there is corroborative evidence of the act;* and
(c) the proponent of the statement notifies the adverse party.
Minn.Stat. § 595.02, subd. 3 (1990) (emphasis added).

9. The confrontation clause requires "reliability" and is not violated when a child's out-of-court statement is admitted under a "firmly-rooted" hearsay exception, such as an excited utterance, "because of the weight accorded long-standing judicial and legislative experience in assessing the trustworthiness of certain types of out-of-court statements." *Idaho v. Wright,* 497 U.S. 805, 817, 110 S.Ct. 3139, 3147, 111 L.Ed.2d 638 (1990), *quoted in State v. Lanam,* 459 N.W.2d 656, 661 (Minn.1990).

than they were at the competency hearing. However, a trial court's determination of incompetency does not automatically preclude the admission of the out-of-court statements. *See id.*

The children provided some statements in response to the interviewer's leading questions and the interviewer attempted to keep the children focused on appellants rather than a babysitter that also allegedly abused the children. The children's statements about sexual intercourse and oral sex while playing with anatomically correct dolls, however, demonstrate they were not the type of statements that children of their ages would be expected to make. Although the older girl stated that she hated appellants' house, the record is silent as to any apparent motive independent of general untruthfulness to fabricate allegations against appellants. *See id.* The fact that the children had been questioned by the social worker and Gund before the CornerHouse interviews indicates that the CornerHouse interviewer might anticipate what the children should say, and weighs against trustworthiness. However, our review of the entire record leads us to conclude that the admission of the videotaped interviews did not violate appellants' constitutional right to confront their accusers. *See id.*

 We also conclude the children's statements to their therapists were sufficiently trustworthy for confrontation clause purposes. The older girl's and the younger girl's statements that they had been "hurt" by appellants appear to have been made spontaneously and not in response to a leading question. Similarly, the record indicates that the boy spontaneously stated to Dr. Urbain that he saw Ronald Goldenstein "humping" his two sisters and that both Ronald Goldenstein and Spolar participated in sexual abuse. Nothing in the record indicates that these statements were in response

to a leading question. Both therapists saw the children after the sexual abuse allegations had come to light and consequently had some preconceived idea of the types of statements sexually abused children might typically make during treatment. However, based upon the totality of the circumstances, we conclude the statements were admissible and did not violate the confrontation clause. *See id.*

### III.

Pursuant to *State v. Paradee*, 403 N.W.2d 640, 642 (Minn.1987), the trial court conducted in camera review of the child protection records that predate the children's placement in appellants' home, and contain information about the biological family and the history of maltreatment. The court determined that certain information was not relevant to the defense and consequently not discoverable.[10] The trial court also denied appellants' access to videotaped interviews of the three children at CornerHouse conducted during the investigation of the sexual abuse allegations against Spolar.

Appellants claim the trial court erred in refusing defense counsel access to this information, arguing it would have been helpful in preparation of his defense. We agree in part. In *Paradee*, the court stated:

> in camera [review] strikes a fairer balance between the interest of the privilege holder in having his confidences kept and the interest of the criminal defendant in obtaining all relevant evidence that might help in his defense. We believe that *trial courts, who by training and experience are qualified for the task of determining matters of relevancy, are capable of determining what if any of the information in the records might help in the defense.*

*Id.* (emphasis added).[11] A trial court's determination that the records are not helpful in

---

**10.** On January 29, 1992, the trial court, subsequent to the first order on October 2, 1991, again denied appellants' request to have access to the child protection records while the children lived with their biological mother and investigative data regarding the children's allegations of sexual abuse committed by persons other than appellants.

**11.** In *State v. Paradee*, 403 N.W.2d 640, 641–42 (Minn.1987), in approving the in camera approach, the court quoted from *Pennsylvania v. Ritchie*, 480 U.S. 39, 61–62, 107 S.Ct. 989, 1003, 94 L.Ed.2d 40 (1987) regarding the state's interest in assuring the confidentiality of child protection records:

the defense is "subject ultimately to judicial review." *Id.*

We have obtained the in camera child protection records and videotaped interviews reviewed by the trial court judge. Based upon our independent review of the child protection records, we conclude that the trial court did not abuse its discretion in denying defense counsel access to the undisclosed child protection records. *See id.* However, because we conclude that the children's prior false accusations against Spolar are admissible in the new trial, the videotaped interviews during which the children indicate they were not sexually abused by Spolar should be made available to appellants under *Paradee.* *See id.*

## IV.

### A. Admission of Evidence

The standard of review of a trial court's evidentiary rulings is whether the trial court abused its discretion; this court will not lightly overturn a trial court's evidentiary ruling. *Kelly,* 435 N.W.2d at 813.

#### 1. Pornographic evidence

The trial court admitted "Little Darlings" after appellants put their character in issue. Appellants' counsel, acknowledging character was in issue, moved to admit the other two magazines. On the record before us, we conclude the trial court did not err in admitting "Little Darlings." [12]

#### 2. Nude photographs

The trial court did not admit the nude photographs of appellants but allowed the police officers who searched appellants' home to describe the photographs to the jury. The children's out-of-court statements indicated that appellants took photographs of sexual acts. Photographs that appellants

had taken of themselves in the 1970s and as late as 1983 are probative of the question whether appellants photographed the children engaged in sexual acts. Therefore, the trial court was within its discretion in permitting the officers to describe the photographs. *See id.*

### 3. Prior bad acts evidence

The trial court ruled that if appellants presented evidence of their good character, evidence that Ronald Goldenstein struck the older girl after she started the car fire would be admissible. *See* Minn.R.Evid. 404 (admission of character evidence). The inherent problem with the trial court's ruling is that the child protection finding speaks to physical abuse and not sexual abuse. Thus, whether Ronald Goldenstein struck the older girl was not offered to show he acted in conformance with that character when he sexually abused her. Such evidence, however, did refute appellants' evidence that they were fit foster parents, and was properly admitted.

### B. Prosecutorial Misconduct

Appellants' contention that the prosecutor failed to provide relevant discovery in connection with the Wilder records of Westrell and Dr. Urbain is moot in view of our remand for a new trial. We note only that there is no indication in the record that the prosecutor intentionally withheld the medical records. Also, it appears that by the time the trial was concluded, all relevant records were available to both parties and will be available on retrial.

Appellants also claim the prosecutor committed misconduct in questioning witnesses in a manner implying facts that the state could not prove. A new trial may be required for prosecutorial misconduct where the state asks questions which by innuendo

---

Child abuse is one of the most difficult crimes to detect and prosecute, in large part because there often are no witnesses except the victim. A child's feelings of vulnerability and guilt, and his or her unwillingness to come forward are particularly acute when the abuser is a parent. * * * [A state's] purpose would be frustrated if this confidential material had to be disclosed upon demand to a defendant charged with

criminal child abuse, simply because a trial court may not recognize exculpatory evidence.

12. Absent evidence that the older girl, the younger girl or the boy had seen the pornography or that evidence of possession of such literature is probative of ascertaining whether appellants fit a "profile," the magazine is of little relevance.

may lead to a prejudicial supposition as to the existence of facts that cannot be proved. *State v. Currie*, 267 Minn. 294, 301, 126 N.W.2d 389, 395 (1964). The prosecutor questioned the police officers about the search warrant, inquiring into why the warrant listed photographs and pornography. This line of questioning was proper. However, the prosecutor also asked why the search warrant listed address and telephone directories. The officers responded that typically sexual abusers may buy and sell photographs and the directory may provide a list of contacts. This prejudicial question implies appellants participated in exchange of child pornography and was improper. *See id.*

■ Third, appellants claim prosecutorial misconduct in the cross-examination of defense witnesses. The prosecutor asked the children's two social workers that preceded Spolar whether they were aware that an intake worker had made a finding that sexual abuse had occurred in the house. Appellants did not object to the question and now contend the questions regarding the finding of sexual abuse were prejudicial and went to the ultimate issue for the jury. However, appellants called both social workers to the stand to testify as to their suitability as foster parents. The questioning went to the witnesses' knowledge that the agency had found maltreatment and abuse. Given the nature of the testimony of the prior social workers, the questioning was not improper.

Fourth, appellants claim the prosecutor committed prejudicial misconduct in summation. Appellants did not object during the closing argument, largely diminishing any claim that the misconduct was prejudicial. *See State v. Morgan*, 477 N.W.2d 527, 531 (Minn.App.1991) (failure to object at trial may constitute forfeiture of right to challenge prosecutor's statements), *pet. for rev. denied* (Minn. Jan. 17, 1992).

The supreme court has again recently addressed prosecutorial misconduct. The court stated that a prosecutor is governed by a unique set of rules which

> follow directly from the prosecutor's inherently unique role in the criminal justice system, which mandates that the prosecutor not act as a zealous advocate for crimi-

nal punishment, but as the representative of the people in an effort to seek justice.

*State v. Walsh*, 495 N.W.2d 602, 606 (Minn. 1993). The court held that it must look at the closing argument "as a whole, rather than just select phrases or remarks that may be taken out of context or given undue prominence." *Id.* at 607.

■ Here, the prosecutor commented on the inadmissible nude photographs of appellants engaged in sexual acts and on the boy's statement that Ronald Goldenstein took the pictures of the children to a store. In that regard, the prosecutor said "[w]e can only speculate about what that store was about." The prosecutor also commented upon the boy's statements about abuse by a babysitter named Jesse and Ronald Goldenstein's denial that a woman by that name ever babysat the children, implicating appellants' "outrageous abuse" including "hir[ing] a babysitter who was in on it too." These comments were prejudicial in that they infer that appellants participated in a larger sex ring. There was no substantive evidence of such activity.

■ Finally, the prosecutor was in error when questioning the children's previous social workers regarding the Minnesota Data Practices Act and then commenting about appellants' counsel's apparent violation of the act when appellants' attorneys provided current child protection records to the children's prior social workers. *See State v. Wahlberg*, 296 N.W.2d 408, 420 (Minn.1980) (prosecutor's remarks improper where not justified by evidence).

## V.

■ Appellants challenge the sufficiency of the evidence to support their convictions. On the constitutionally defective record before us, which limited appellants' right to present their defense and theory of the case, we are compelled to conclude that there was sufficient evidence to support appellants' convictions. *See State v. Webb*, 440 N.W.2d 426, 430 (Minn.1989) (sufficiency challenge fails when evidence, viewed in the light most favorable to the conviction, was sufficient to permit jurors to reach the verdict they did).

## VI.

The trial court sentenced each appellant to 120 months in prison for criminal sexual conduct in the first degree, an upward durational departure from the 86–month sentence presumed for a severity level VIII crime under August 1, 1989, guidelines. Ronald Goldenstein was additionally sentenced to a consecutive stayed 21–month term for criminal sexual conduct in the second degree. Appellants argue that they should have been sentenced under the 1987 guidelines.[13]

The date of the offense is important for sentencing purposes. Minn.Sent.Guidelines, cmt. II.A.02. "For those convicted of a single offense, there is generally no problem in determining the date of the offense." *Id.* This case, however, does not fit the general situation contemplated by the guidelines. Appellants were convicted of a single offense occurring sometime during a three-year period.[14] The sentencing guidelines provide:

[m]odifications to the Minnesota Sentencing Guidelines will be applied to offenders whose *date of offense is on or after the specified modification effective date.*

Minn.Sent.Guidelines III.F (emphasis added). If the date of the offense is not specified in the complaint and cannot be ascertained with certainty, "the judge shall establish the relative order of events." Minn.Sent.Guidelines, cmt. II.A.02.b. In this case the trial court apparently determined that the offenses occurred after August 1, 1989, since it based its sentence on the August 1, 1989, guidelines.

Where multiple offenses are an element of the crime, the sentencing guidelines state that "the date of the earliest offense should be used as the date of the conviction offense." *Id.* Appellants argue that their alleged crime can be equated to multiple offense criminal sexual conduct and therefore it must be assumed that the offenses with which they are charged occurred before August 1, 1989. We do not believe that appellants come within the protection of this guideline. The state did not charge appellants with a crime involving multiple offenses.

The state argues that appellants' failure to request a special jury interrogatory to resolve whether the conduct occurred before or after August 1, 1989, constituted a waiver, and cites two recent Minnesota Supreme Court cases construing application of the patterned sex offender statute to support its argument. *See* Minn.Stat. § 609.346, subd. 2a (1990) (effective August 1, 1989) (court shall sentence defendant to 37 years if the person is convicted of criminal sexual conduct in first or second degree and has two previous criminal sexual conduct convictions). Because we reverse the convictions and remand for a new trial, any question of waiver in the first trial is arguably irrelevant. However, because the issue may recur on retrial, we offer the following guidance based upon the record before us.

In *State v. Robinson,* 480 N.W.2d 644, 646 (Minn.1992), the court held that a "defendant ha[s] a right to let the jury authoritatively decide" whether the sexual abuse occurred before or after the effective date of the statute. Unless a defendant's failure to request a special interrogatory verdict is excusable, a defendant waives the right to have the fact finder authoritatively resolve the issue. *Id.* In submitting a special interrogatory to permit the jury to determine the date of an offense, doubt as to when the offense oc-

---

**13.** The sentencing guidelines in effect before the 1989 amendments would provide a presumptive sentence of 43 months for criminal sexual conduct in the first degree.

**14.** The state charged appellants with single offense criminal sexual conduct crimes occurring sometime between May 1987 and May 1990. The criminal complaint did not allege specific dates of sexual penetration or contact. Appellants moved to dismiss the complaint for lack of specificity in the dates of alleged sexual abuse under *State v. Becker,* 351 N.W.2d 923, 927 (Minn.1984). Although the record reveals no specific ruling on the motion, the trial court apparently held the three-year period was specific enough as the trial proceeded through adjudication. No trial testimony attempted to focus on the dates of alleged sexual abuse. None of the children's out-of-court statements pinpointed dates of the alleged sexual activity. Thus, neither this court nor the trial court can determine with certainty that appellants committed criminal sexual conduct either before or after August 1, 1989.

curred should be resolved in favor of the defendant, not the state. *Id.*

*State v. Murray*, 495 N.W.2d 412, 412 (Minn.1993), held that defendant, by failing to object to a general verdict, waived his right to have the fact finder determine if the criminal sexual conduct occurred before or after August 1, 1989. Because defendant's failure to request a special interrogatory verdict was not excused, the "trial judge, in its role of sentencing judge, was free to resolve this issue." *Id.* at 413. The *Murray* court, however, stated:

> [Defendant] can be sentenced under the patterned sex offender statute * * * only if there is *no* reasonable likelihood that all of [defendant's] multiple acts of penetration of the child in question during the year in question occurred before the statute became effective.

*Id.* (emphasis in original).

Because the trial court in *Robinson* did, in fact, submit a special interrogatory verdict, the supreme court was not required to determine whether defendant by not requesting a special interrogatory waived his right to have the jury determine the date of the single incident of criminal sexual conduct. While in dicta the court in *Robinson* stated that the "failure to object *could* be deemed to constitute a waiver," *Robinson*, 480 N.W.2d at 646 (emphasis added), it appears that in that case there was some evidence upon which the jury could have determined the date of the offense.[15]

*Robinson* is distinguishable from this case. On the record before us for review, no trial testimony addressed the dates of the offense. Asking the jury to resolve whether the conduct occurred before or after August 1, 1989, would have been fruitless. We conclude that appellants' failure to request a special jury interrogatory was "excusable." *See State v. Olson*, 379 N.W.2d 524, 527 n. 5 (Minn.1986) (failure to object to general verdict of second degree murder, where defendant was also charged with felony murder that was later retroactively reclassified to a lower severity level crime, was excusable where at the time either conviction resulted in the same presumptive sentence). Because the failure to request a special interrogatory verdict was excusable, the sentencing court was not in a position to resolve this factual dispute. *See Murray*, 495 N.W.2d at 413. Doubt as to whether appellants' conduct occurred before or after August 1, 1989, should be resolved in their favor, not the state's. *See Robinson*, 480 N.W.2d at 646.[16]

■ The trial court erred in sentencing appellants as though the single incident of sexual misconduct occurred after August 1, 1989. Imposition of the current sexual guidelines runs afoul of the ex post facto prohibition in the federal and state constitutions. *See Miller v. Florida*, 482 U.S. 423, 435–36, 107 S.Ct. 2446, 2454, 96 L.Ed.2d 351 (1987) (retroactive application of sentencing guidelines violates ex post facto provision of the federal constitution); *Robinson*, 480 N.W.2d at 645 (application of patterned sexual offender statute to offenses committed before August 1, 1989, would violate the constitutional prohibition against ex post facto laws).

## DECISION

The trial court's exclusion of evidence violated appellants' constitutional right to present a defense. The convictions are reversed and the cases are remanded for a new trial.

**Reversed and remanded.**

---

15. This court observed in *Robinson* that "trial testimony did not *conclusively* establish when the abuse took place," *State v. Robinson*, 476 N.W.2d 896, 901 (Minn.App.1991) (emphasis added), *aff'd as modified* 480 N.W.2d 644.

16. We do not speculate as to what evidence will be presented on retrial. We expect that, if appropriate, appellants will request a special interrogatory pursuant to *State v. Robinson*, 480 N.W.2d 644, 646 (Minn.1992).