*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-1088**

State of Minnesota,
Respondent,

vs.

Donavon Duane Bellanger,
Appellant.

**Filed August 25, 2014
Affirmed
Hooten, Judge**

Becker County District Court
File No. 03-CR-11-534

Lori Swanson, Attorney General, Michael Everson, Assistant Attorney General, St. Paul, Minnesota; and

Gretchen D. Thilmony, Becker County Attorney, Detroit Lakes, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Benjamin J. Butler, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Reyes, Presiding Judge; Hooten, Judge; and Willis, Judge.[*]

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**HOOTEN**, Judge

Appellant challenges his conviction of first-degree criminal sexual conduct, contending that the district court committed reversible error by excluding extrinsic evidence of the victim's prior false allegations of sexual and physical abuse. Because the district court did not abuse its discretion in finding that appellant failed to meet his burden of proving the existence and falsity of such allegations, we affirm.

## FACTS

In 2004, appellant Donavon Duane Bellanger and his wife, Ashley, became legal guardians for D.B., M.B., and J.B, who were then the 7-, 5-, and 3-year-old children of appellant's brother. In March 2011, D.B. told her father, his girlfriend, and her friend, M.S., that appellant "was touching her." D.B.'s father and his girlfriend contacted a crisis center and brought D.B. to the hospital, where they spoke with Officer Tyron Warren of the Becker County Sheriff's Department. After the hospital visit, Officer Warren accompanied D.B.'s father and his girlfriend to pick up the other two children at appellant's house. As Officer Warren was picking up the children, he became aware that appellant had taken multiple pills and left a note for his brother referring to D.B.'s claims of abuse. Because appellant was nonresponsive, an ambulance was called and he was treated for a drug overdose.

Appellant was subsequently charged with first-degree criminal sexual conduct for sexual abuse of D.B., involving multiple acts committed between May 2010 and March 2011, in violation of Minn. Stat. § 609.342, subd. 1(h)(iii) (2010). Appellant denied the

charges and claimed that D.B., who was dating a young man, was fabricating these claims so that appellant could not punish her for violating his rule prohibiting D.B. from dating. Before trial, appellant moved the district court to allow him to cross-examine D.B. regarding "specific instances of dishonesty" and to allow him to present extrinsic evidence through documents and testimonies about D.B.'s prior false accusations of abuse. Appellant also moved the district court to direct certain social-service organizations to produce documents regarding D.B. for an in camera review, claiming that these documents would support his claims.

In support of the motion, appellant submitted two affidavits, one from himself and the other from Ashley. Both affidavits stated that D.B. had made three false allegations, which were reported to social services: (1) that Ashley grabbed D.B.'s hair and slammed her around; (2) that D.B.'s grandmother's boyfriend sexually abused her; and (3) that D.B.'s father sexually abused her and her siblings. According to appellant and Ashley, D.B. later "recanted" each of these allegations and admitted to social services that she had fabricated them because she was upset with Ashley for disciplining her, she was angry at her grandmother for not wanting to live with the children, and she was mad at her father for not visiting them.

The district court granted appellant's motion for an in camera review of documents from the social-service organizations. Upon review, the district court declared that it "found nothing in those documents that was consistent with sexual abuse claims or recantations" made by D.B. There was only one vague reference to sexual abuse by a relative, but there was "no reference to recantations," "no reference to anyone

3

ever having followed up," and "nothing consistent with [appellant's and Ashley's] affidavits." The identity of the victim of this alleged abuse was also uncertain.

The district court concluded that the documents did not support appellant's and Ashley's claims that D.B. was dishonest or had a history of making false accusations. The district court ruled that appellant could attack D.B.'s credibility with opinion or reputation evidence and cross-examine her on the specific alleged instances of false accusations. The district court explained that if D.B. denied the allegations, appellant was not allowed to bring in extrinsic evidence to disprove her denial, and that neither appellant nor Ashley could testify regarding D.B.'s purported false allegations.

At trial, D.B. testified that appellant sexually abused her on multiple occasions. The first time was when she fell asleep in the car while appellant was driving. D.B. testified that she "woke up and . . . felt his hands and [saw] his hands in [her] pants." Another time, D.B. and appellant drove to a lake, and appellant had sex with D.B. despite her refusal. D.B. and appellant also had sex at other times in different places, including a trailer house under construction, Ashley's car, appellant's bed, and a treehouse.

D.B. testified that when appellant learned that a male friend had given her a necklace, appellant grabbed it and threw it away. According to D.B., appellant made her wear his gold-chain necklace so that others would know that she belonged to him. On another occasion, appellant destroyed D.B.'s cell phone when he saw a text from a boy.

Soon after these incidents, on March 4, 2011, M.B. advised D.B. as they were riding home on the school bus that she had seen a boy hugging D.B. at school. M.B. told D.B. that she was going to tell appellant. D.B. claimed that, at this point, she "just got

sick of it" because she knew that appellant "was going to get mad" like he did before, so she "got off the bus" and told her friend, her father, and her father's girlfriend about the way appellant had been "touching" her.

M.B. testified that she would see appellant putting his hand on D.B.'s thigh whenever D.B. sat next to him in the front seat of the car. She also testified that when Ashley was not at home at night, D.B. would sleep in appellant's bed. She testified that one night, she awoke and went into appellant's bedroom. There, she saw D.B., in only her shirt with no underwear, sleeping on the bed next to appellant.

D.B.'s friend, K.H., testified that the first time that D.B. had told her that appellant was molesting her, D.B. was crying and upset. D.B. also showed K.H. kiss marks on her cleavage, which D.B. claimed were made by appellant. K.H. also observed D.B. wearing a gold chain. K.H. testified that D.B. had told her that the chain belonged to appellant and that he made her wear it. When K.H. questioned her as to why she had not reported the molestation, D.B. explained that she was scared that if she told anyone, she and her siblings would be split up. D.B. also explained about the incidents involving the gold chain getting ripped off of her neck by appellant and his angry response to her receiving a text message from a boy on her cell phone. A few months later, in March 2011, K.H. received a telephone call from D.B. as she was riding a bus home from school. D.B. told her that she did not want to go to appellant's home because she was afraid that she would get into trouble for dating boys.

On cross-examination, D.B. was not asked any questions about whether she had made any prior false accusations about physical or sexual abuse. But Ashley testified

that D.B. had a reputation for lying and that they had her in therapy to help her deal with her dishonesty. Ashley also testified that she and appellant were concerned with D.B.'s association with boys and had a rule that D.B. could not date. On the night before D.B. made the accusations against appellant, Ashley and appellant had threatened to remove her from public school and to home-school her if she was caught with another boy.

Although a consensual search was done of appellant's house approximately six days after law enforcement was contacted, and D.B.'s underwear and bedding were analyzed, there was no finding of any semen or blood. A doctor testified that while D.B.'s physical examination was normal with no signs of lesions, scars, or bruising, such examination was not inconsistent with her claims of sexual abuse.

There was testimony that appellant was often alone with D.B., either on errands or engaging in recreational activities, and that Ashley was often away from the home for up to a week at a time for medical treatments. But there was no evidence that anyone witnessed appellant performing any sexual acts with D.B.

The jury found appellant guilty of first-degree criminal sexual conduct. This appeal follows.

## D E C I S I O N

We review evidentiary rulings for an abuse of discretion. *State v. Goldenstein*, 505 N.W.2d 332, 340 (Minn. App. 1993), *review denied* (Minn. Oct. 19, 1993). Even if error exists, we will not reverse if the error was harmless. *Id.*

The credibility of a witness may be attacked by evidence in the form of opinion or reputation. Minn. R. Evid. 608(a). Specific instances of the witness's conduct probative

6

of truthfulness may be inquired into on cross-examination but may not be proved by extrinsic evidence. *Id.* (b). Admission of evidence of prior sexual conduct of the victim in a criminal-sexual-conduct case is governed by Minn. R. Evid. 412, commonly known as the rape-shield rule. Under this rule, evidence of the victim's prior sexual conduct "shall not be admitted nor shall any reference to any such conduct be made in the presence of the jury, except by court order under" the rule's procedure. Minn. R. Evid. 412(1). Prior sexual conduct includes prior allegations of sexual abuse. *State v. Kobow*, 466 N.W.2d 747, 750 (Minn. App. 1991), *review denied* (Minn. Apr. 18, 1991).

A defendant's constitutional right to present a complete defense creates an exception to the rape-shield rule. *See Goldenstein*, 505 N.W.2d at 340 (holding that the "exclusion of evidence of [the victim's] prior false allegations violated [defendants'] constitutional right to present a defense"). Under this exception, "evidence of prior false accusations is admissible both to attack the credibility of the complainant and as substantive evidence tending to prove that the instant offense did not occur." *Id.*

"Before evidence of prior false accusations is admissible, however, the [district] court must first make a threshold determination outside the presence of the jury that a reasonable probability of falsity exists" regarding previous reports of sexual assault by the victim. *Id.* The burden is on a defendant to show that a victim's sexual history is relevant and should be admitted despite the rape-shield rule. *See State v. Crims*, 540 N.W.2d 860, 868 (Minn. App. 1995) (stating that, "[u]nless and until a defendant shows the victim's sexual history to be relevant to the facts at bar, this particular form of

7

character evidence simply is not admissible under the normal rules of evidence"), *review denied* (Minn. Jan. 23, 1996).

Appellant relies on *Goldenstein* and argues that the district court abused its discretion by excluding extrinsic evidence of D.B.'s prior false accusations. Appellant claims that because he was not allowed to present extrinsic evidence of D.B.'s prior false accusations, his right to present a complete defense under the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment was violated.[1]

The only proffered evidence of D.B.'s prior false allegations was appellant's and Ashley's affidavits claiming that D.B. made these false allegations to social workers and then recanted the allegations. They claimed that the social-services records would corroborate their claims. The district court granted appellant's motion for an in camera review of the social-services records in order to determine whether there was support for appellant's claim that D.B. had made, and recanted, false accusations of abuse to social services. After reviewing those records and finding nothing to support such claims, the district court concluded that the affidavits were unreliable and that the unsupported

---

[1] Appellant does not contest the district court's application of Minn. R. Evid. 608(a) and (b) in allowing appellant to present evidence regarding D.B.'s character or reputation for truthfulness or untruthfulness and to cross-examine D.B. about specific instances in which she purportedly made false accusations of abuse. The district court prohibited appellant from presenting extrinsic evidence of D.B.'s purported acts of misconduct if she denied that she had made any false accusation, noting that appellant would be "stuck" with her answer. *See State v. Nelson*, 148 Minn. 285, 296, 181 N.W. 850, 855 (1921) (holding that a cross-examiner may not disprove an answer by extrinsic evidence because this is deemed to be an inquiry into a collateral matter). At trial, appellant did not cross-examine D.B. about specific instances in which she made false accusations of abuse, but presented extensive testimony about D.B.'s reputation and character for untruthfulness. Appellant appears to be arguing that, notwithstanding the district court's correct application of rule 608, his constitutional right to a defense was violated.

8

statements of appellant and Ashley were insufficient to show a reasonable probability that D.B. made any prior allegations of abuse, let alone that the allegations were false. On this basis, the district court concluded that appellant failed to meet his burden of showing that the purported prior false accusations were admissible under *Goldenstein*.

Appellant argues that, "[i]nstead of evaluating the credibility of appellant's and Ashley Bellanger's proposed testimony, the district court should only have considered whether that testimony, if accepted by [the] jury as credible, *related* to 'prior false allegations.'" (Emphasis added.) He contends that credibility is an issue for the jury "in all contexts" and cites *State v. Blom* for its determination that "the district court inappropriately made a credibility assessment in rejecting the [proposed witness's] testimony when all that was required was a determination of whether the inherent tendency connection, beyond a bare suspicion, had been made." 682 N.W.2d 578, 621 (Minn. 2004).

But under appellant's reasoning, a defendant could always pierce the rape shield by simply claiming that the victim had made prior false allegations. And appellant's reliance on *Blom* is misplaced. *Blom* involved a proffer of alternative-perpetrator evidence, which is admissible if the evidence has an "inherent tendency" to link the alternative perpetrator to the crime. *See id.* Admissibility under the reasonable-probability standard, however, requires more than a tendency that the proffered evidence would be relevant to D.B.'s prior false allegations of sexual abuse. By requiring a finding of reasonable probability, *Goldenstein* directs the courts to evaluate not only the *relevancy* of proffered evidence, but also the *weight* of such evidence. Indeed, the

9

*Goldenstein* court cited persuasive caselaw in adopting the reasonable-probability standard, 505 N.W.2d at 340, and these foreign jurisdictions have determined that credibility is an issue for the district court in determining whether reasonable probability exists, *see, e.g.*, *Roberts v. State*, 648 S.E.2d 783, 785 (Ga. Ct. App. 2007) (stating that proffered evidence of a victim's false allegations "merely presented a credibility issue for the [district] court . . . to resolve in analyzing whether there was a reasonable probability of falsity"); *Richardson v. Commonwealth*, 590 S.E.2d 618, 621 (Va. Ct. App. 2004) (stating that "inherently self-serving" testimony "does not, by itself, establish falsity").

Moreover, appellant is incorrect that credibility is always an issue for the jury. Credibility may be an issue for the district court if the standard of admissibility imposes the obligation of evaluating credibility on the district court. For example, "it is the function of the [district] court to weigh the credibility of a witness when determining at [a] *Spreigl* hearing whether allegations of misconduct are supported by clear and convincing evidence" and are admissible. *State v. Heath*, 685 N.W.2d 48, 59 (Minn. App. 2004) (quotation omitted), *review denied* (Minn. Nov. 16, 2004). Appellant contends that *Spreigl* evidence is inapposite because the clear-and-convincing standard of admissibility is provided by Minn. R. Evid. 404(b) but the reasonable-probability standard is the product of caselaw interpretation of a defendant's constitutional right to present a defense. Appellant fails to convince us that this distinction matters. In either scenario, the district court is required to weigh the credibility and reliability of evidence to determine its admissibility in a criminal trial.

The district court did not abuse its discretion in finding that appellant failed to show a reasonable probability that D.B. had made false accusations of abuse. Because there is no reasonable probability of falsity, the district court did not err by excluding extrinsic evidence of D.B.'s alleged false accusations.

**Affirmed.**